**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Juan Manuel SANCHEZ–VARGAS,
Defendant–Appellant.**

No. 87–5346.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 4, 1988.

Decided June 27, 1989.

Steven Meinrath and Debra P. Kanevsky, Federal Defenders of San Diego, Inc., San Diego, Cal., for defendant-appellant.

Melanie K. Pierson and Roger W. Haines, Asst. U.S. Attys., San Diego, Cal., for plaintiff-appellee.

Before ALARCON, FERGUSON and NORRIS, Circuit Judges.

FERGUSON, Circuit Judge:

Appellant Juan Manuel Sanchez–Vargas appeals his convictions for bringing an alien into the United States in violation of 8 U.S.C. §§ 1324(a)(1)(A) and transporting an alien within the United States in violation of § 1324(a)(1)(B) of the Immigration Reform and Control Act. Sanchez–Vargas contends that the border patrol agent who apprehended him lacked adequate cause to stop his vehicle, and that the district court erred in sentencing him to consecutive prison terms for the two offenses. While the district court properly determined that the requisite level of suspicion attended the stop of Sanchez–Vargas' vehicle, we conclude that the court's decision to sentence Sanchez–Vargas for both bringing in and transporting aliens was improper.

## I.

On July 28, 1987, Sanchez–Vargas was stopped by Border Patrol Agent Scott while driving his light-colored sedan near the Otay Mesa Port of Entry at the Mexico–California border. At the pre-trial suppression hearing, Agent Scott testified that he had received radio transmissions from two other Border Patrol Agents minutes before stopping Sanchez–Vargas' vehicle. The first transmission, from Agent Jumbeck, concerned Jumbeck's recent observation of three vehicles driving through the international boundary fence west of the Otay Mesa Port of Entry. Agent Jumbeck described the vehicles as one van, one pickup, and one light-colored sedan. Within five minutes, Agent Scott received a transmission from another officer, Agent Holguin, stating that he had observed the three vehicles described by Jumbeck heading southbound on the highway after making a U-turn. Holguin then radioed Scott with the observation that the light-colored sedan had just made another U-turn on the highway, and was now heading northbound. Scott was less than a mile away from Holguin's location at the time of the second transmission.

After receiving Agent Holguin's transmissions, Scott saw a light-colored sedan driving northbound on the highway, carrying two riders of apparent Hispanic descent in the front seat. Scott testified at the suppression hearing that the "cautiously" driven sedan appeared to be "riding heavily" in the rear, swayed a bit, and rode on bulging tires as though heavily laden. Scott further testified that the sedan was traveling in an area notorious for smuggling activity. After following the sedan for five minutes, Scott activated his emergency lights to stop the sedan. A two-mile high-speed chase ensued. Scott arrested Sanchez–Vargas after the sedan had spun out and come to rest along the center divider.

Sanchez–Vargas was subsequently indicted under the Immigration Reform and Control Act for two counts of "bringing in" aliens to the United States in violation of 8 U.S.C. § 1324(a)(1)(A) and two counts of transporting aliens within the United States in violation of 8 U.S.C. § 1324(a)(1)(B).[1] Prior to trial, Sanchez–

---

1. 8 U.S.C. § 1324(a)(1) provides that any person who—

 (A) knowing that a person is an alien, brings to or attempts to bring to the United States in any manner whatsoever such person at a place other than a designated part of entry or place other than as designated by the Commission regardless of whether such alien has received prior official authorization to come to, enter, or reside in the United States and regardless of any future official action which may be taken with respect to such alien;

 (B) knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of the law, transports, or moves, or attempts to transport or move such alien within the United States by means of transportation or otherwise, in furtherance of such violation of law;

 (C) knowing or in reckless disregard of the fact that an alien has come to, entered, or re-

Vargas sought to suppress the evidence of the presence of the aliens discovered as a result of the stopping of his sedan, contending that Agent Scott lacked "founded suspicion" to make the investigative stop. At the suppression hearing, Agent Scott served as the sole government witness. Scott testified that his decision to stop the Sanchez–Vargas vehicle was based both on his own observations of the sedan and on the radio transmission received from Agents Jumbeck and Holguin. The district court denied Sanchez–Vargas' motion to suppress.

Pursuant to a plea agreement, Sanchez–Vargas subsequently pleaded guilty to one count of bringing in aliens and one count of transporting aliens. The terms of the plea agreement also reserved Sanchez–Vargas' right of appeal on the district court's denial of his motion to suppress. The district court sentenced Sanchez–Vargas to consecutive terms of eighteen months' imprisonment for the offense of bringing aliens and three years' probation for the transport offense.

## II.

We undertake *de novo* review of issues concerning the determination of "founded suspicion," *United States v. Sutton*, 794 F.2d 1415, 1425 (9th Cir.1986); *United States v. McConney*, 728 F.2d 1195, 1201 (9th Cir.1984) (en banc), and of challenges to the legality of a criminal sentence. *United States v. Arbelaez*, 812 F.2d 530, 532 (9th Cir.1987); *United States v. Palacios*, 835 F.2d 230, 233 (9th Cir.1987).

## III.

### A.

■■■ Founded suspicion to make a brief investigatory stop of a vehicle in a border area exists where an officer is "aware of specific articulable facts, [taken]

together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country." *United States v. Brignoni–Ponce*, 422 U.S. 873, 884, 95 S.Ct. 2574, 2582, 45 L.Ed.2d 607 (1975); *see also United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981) ("detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity"); *Sutton*, 794 F.2d at 1426; *United States v. Garcia–Nunez*, 709 F.2d 559, 561 (9th Cir.1983). In assessing the facts, officers are entitled to draw appropriate deductions in light of their experiences as border patrolmen, the characteristics of the particular area, and their knowledge of alien smuggling activities. *United States v. Urias*, 648 F.2d 621, 623 (9th Cir.1981) (citing *Brignoni–Ponce*, 422 U.S. at 884–85, 95 S.Ct. at 2581–82).

In light of these principles, Agent Scott clearly had "founded suspicion" to stop Sanchez–Vargas' sedan. From the first-hand observations of the other Border Patrol agents relayed to him over the radio, Agent Scott had a description of the sedan and its apparently illegal method of entry into the United States. Moreover, prior to stopping the sedan, Scott personally observed a heavily loaded vehicle matching the dispatched description, driven by a man of apparent Hispanic descent, proceeding "cautiously" northbound along a border-area road frequented by alien smugglers. Taken together, this information available to Agent Scott, including the radio transmissions of the other Border Patrol agents and his own personal observations, provided him with specific and articulable facts sufficient to warrant an investigative stop of Sanchez–Vargas' vehicle. *See, e.g., United States v. Medina–Gasca*, 739 F.2d 1451, 1453 (9th Cir.1984); *United States v. Urias*, 648 F.2d at 622–23; *United States v.*

mains in the united States in violation of law, conceals, harbors or shields from detection, or attempts to conceal, harbor, or shield from detection, such alien in any place, including any building or any means of transportation; or

 (D) encourages or induces an alien to come to, enter, or reside in the United States, knowing

or in reckless disregard of the fact that such coming to, entry, or residence is or will be in violation of law,

shall be fined in accordance with Title 8, imprisoned for not more than five years, or both, for each alien in respect to whom any violation of this subsection occurs.

*Vasquez–Cazares,* 563 F.2d 1329, 1331 (9th Cir.1977), *cert. denied,* 434 U.S. 1021, 98 S.Ct. 746, 54 L.Ed.2d 769 (1978); *see generally Brignoni–Ponce,* 422 U.S. at 884–85, 95 S.Ct. at 2581–82 (permissible factors on which to base investigative stop of vehicle in border area include proximity of vehicle to border, type and carriage of vehicle, and behavior and appearance of driver).

■ Because Agent Scott decided to stop the sedan based in part on the radio transmissions of Agents Jumbeck and Holguin, Sanchez–Vargas contends that the Government could not establish the validity of the stop "without producing the testimony of the agent[s] whose observations formed the basis of the asserted justification." We find, however, no error in the district court's determination that Agent Scott had "founded suspicion" to stop Sanchez–Vargas' sedan notwithstanding the lack of testimony by the other Border Patrol agents participating in the investigation.

In arguing that Agent Scott lacked sufficient suspicion to stop the sedan, Sanchez–Vargas relies primarily on *United States v. Robinson,* 536 F.2d 1298 (9th Cir.1976). *Robinson* held that a state police officer's stop of an allegedly stolen vehicle was not supported by founded suspicion when the arresting officer relied solely on a radio message from the police dispatcher to substantiate the stop; the detaining officer had no personal knowledge of any facts on which to base an investigatory stop. *Id.* at 1299. Central to the holding of the *Robinson* case was the fact that the police dispatcher himself had relied on a tip from a state agricultural inspector, that the arresting officer knew of the second-hand nature of the dispatched message, and that the government had failed to call either the dispatcher or the inspector to testify. *Id.*

Sanchez–Vargas characterizes *Robinson* as commanding that the government must, in order to establish founded suspicion, produce any officer whose observations contributed in any way to the legal justifica-

tion for the vehicle stop. Such a characterization of *Robinson* paints with too broad a brush. As noted by the district court at the suppression hearing, *Robinson* differs from this case in three significant respects: (1) Agent Scott, unlike the officer in *Robinson,* had observed the vehicle before stopping it, (2) Agent Scott received the radio transmissions directly from other agents observing the situation rather than from a dispatcher, and (3) Agent Scott ultimately made his own judgment that adequate cause existed to stop the vehicle rather than relying on causal judgments made by the party issuing a radio dispatch or bulletin. Thus, unlike *Robinson,* the government in this case was not required to produce Agents Jumbeck and Holguin to establish that Agent Scott himself had sufficient cause to stop Sanchez–Vargas' sedan. So long as the detaining officer relies on particularized and objective facts which, when taken together, create a founded suspicion that the vehicle to be stopped contains illegal aliens, it offends no Fourth Amendment principles that some of that information may have been received from other sources. *See Sutton,* 794 F.2d at 1426–27 (founded suspicion based on collective knowledge of all officers involved in investigation and detaining officers' personal observations); *Vasquez–Cazares,* 563 F.2d at 1331 (founded suspicion based on information received from anonymous informant and personal observations of officers).

**B.**

■ Sanchez–Vargas next contends that the district court erred in imposing separate punishments on his two § 1324(a)(1) offenses.[2] Sanchez–Vargas argues that Congress did not intend multiple punishments for bringing in and transporting aliens where, as here, the underlying criminal conduct consists of the singular act or transaction of driving an undocumented person across the United States–Mexico border. We agree. Because we conclude

---

**2.** While Sanchez–Vargas characterizes the sentencing issue here presented as one involving the propriety of consecutive versus concurrent sentences under § 1324(a)(1), this claim may

also be construed more generally as a challenge to the district court's sentencing order. *See United States v. Anderson,* 850 F.2d 563, 566 & n. 2 (9th Cir.1988); *see also* Fed.R.Crim.P. 52(b).

that the legislative history of § 1324(a)(1) and application of other sentencing authorities counsels against multiple punishments for violations of §§ 1324(a)(1)(A) and (B) under these circumstances, we vacate the sentences with instructions to resentence Sanchez–Vargas on only one of the offenses.

### 1.

 Since the power to define federal criminal offenses and to prescribe their punishments rests wholly with Congress, *Whalen v. United States*, 445 U.S. 684, 689, 100 S.Ct. 1432, 1436, 63 L.Ed.2d 715 (1980); *see also Missouri v. Hunter*, 459 U.S. 359, 368–69, 103 S.Ct. 673, 679–80, 74 L.Ed.2d 535 (1983); *Brown v. Ohio*, 432 U.S. 161, 165, 97 S.Ct. 2221, 2225, 53 L.Ed. 2d 187 (1977), whether Sanchez–Vargas can be punished separately for the offenses of bringing in and transporting aliens proves a function of congressional intent.[3] We begin our analysis of § 1324(a)(1) with the understanding that ambiguities concerning the scope of permissible punishment under this statute must be resolved in favor of lenity. *Whalen*, 445 U.S. at 694, 100 S.Ct. at 1439; *Simpson v. United States*, 435 U.S. 6, 14–15, 98 S.Ct. 909, 913–14, 55 L.Ed. 2d 70 (1978); *Prince v. United States*, 352 U.S. 322, 329, 77 S.Ct. 403, 407, 1 L.Ed.2d 370 (1957); *Bell v. United States*, 349 U.S. 81, 83–84, 75 S.Ct. 620, 622–63, 99 L.Ed. 905 (1955).

Reference to the language of § 1324(a)(1) proves of little assistance in discerning Congress' punishment intentions. Section § 1324(a)(1)'s penalty provision provides a maximum penalty of five years' imprisonment and fines "for each alien in respect to whom *any* violation of this subsection occurs." (Emphasis added). Thus, while Congress made clear that penalties for violating § 1324(a)(1) could be multiplied by the number of aliens involved, it did not clearly authorize additional multiplication of sentences based on the number of subsections violated in a single criminal transaction. Use of the term "any violation" clouds, rather than illuminates, the meaning of § 1324(a)(1)'s penalty provision since it can be reasonably interpreted as either authorizing as many punishments as there are violations of the four statutory subsections, *see* § 1324(a)(1)(A)–(D), or, rather, as permitting only one punishment per transaction irrespective of the number of subsections allegedly violated. *See Castaldi v. United States*, 783 F.2d 119, 121 (8th Cir. 1986) (use of term "any postage stamp" in 18 U.S.C. § 501 rendered statute ambiguous); *United States v. Clements*, 471 F.2d 1253, 1255, 1257 (9th Cir.1972) (ambiguity created by term "any violation" in penalty provision of National Firearms Act).

The legislative history of § 1324(a)(1), though relatively sparse, provides some assistance in our statutory inquiry. While Congress has steadily broadened the scope of this section over the last century with respect to proscribed conduct, the congressional purpose underlying these statutory enhancements lay in the proscription of additional smuggling activities rather than the creation of multiple punishments.

Prior to 1917, predecessor statutes to § 1324(a)(1) criminalized only the bringing in or landing of undocumented aliens into the United States. *See, e.g.*, Act of March 3, 1903, chs. 1011–12, § 8, 32 Stat. 1213, 1215 (repealed 1907); Act of February 20, 1907, ch. 1134, § 8, 34 Stat. 898, 900 (repealed 1917). In 1917, Congress addressed an apparent gap in federal immigration law with the extension of immigration enforcement efforts inland by additionally proscribing the harboring and concealing of undocumented aliens. Act of February 5, 1917, chs. 27–29, § 8, 39 Stat. 874, 880 (repealed 1952); *see also Regulation and Restriction of Immigration*, S.Rep. No. 352, 64th Cong., 1st Sess. 9 (1916) (purpose of amendment "merely to complete the def-

---

**3.** Whether cast in terms of statutory construction or constitutional analysis, appellate review of cumulative sentences serves the function of ensuring that the trial court imposes no greater punishment than the legislature intended. *See Hunter*, 459 U.S. at 366–68, 103 S.Ct. at 678–79;

*Albernaz v. United States*, 450 U.S. 333, 344, 101 S.Ct. 1137, 1145, 67 L.Ed.2d 275 (1981); *Whalen*, 445 U.S. at 697–98, 100 S.Ct. at 1440–41 (Blackmun, J., concurring); *Brown*, 432 U.S. at 165, 97 S.Ct. at 2225.

inition of the crime of smuggling aliens into the United States").

By 1952, heightened concern for economic displacements caused by the growing influx of undocumented alien workers from Mexico prompted Congress to undertake a comprehensive recodification of federal immigration enforcement laws. *See* H.Doc. No. 192, 82d Cong., 1st Sess. 3–5 (1951); President's Commission on Migratory Labor, *Migratory Labor in American Agriculture, reprinted in* Recommendations of the President's Commission on Migratory Labor, at 6–8 (1951). Seeking to "strengthen the law generally in preventing aliens from entering or remaining in the United States illegally," S.Rep. No. 1145, 82d Cong., 2d Sess. 2 (1952); H.Rep. No. 1377, 82d Cong., 2d Sess. 1–2 (1952), Congress broadened the coverage of the 1917 immigration legislation by creating the additional offenses of transporting aliens within the United States and inducing or encouraging the entry of aliens into the United States. Act of March 20, 1952, ch. 108, § 1, 66 Stat. 26 (codified as amended at 8 U.S.C. § 1324(a)(1) (1986)) [hereinafter "March Act"]. Of particular concern here, congressional debate regarding the March Act suggests that the transport offense was directed, in large part, at curbing the widespread practice of transporting illegal immigrants, already in the United States, to jobs and locations away from the border where immigration enforcement resources may have been more scarce.[4] Thus, as in 1917, the congressional purpose underlying the creation of additional smuggling offenses appears to have been a remedial one of closing perceived gaps in federal immigration enforcement laws.[5]

With the passage of the Immigration and Nationality Act in June of 1952, ch. 477, 66 Stat. 163, Congress enacted a comprehensive recodification of all federal immigration and naturalization laws. While the Immigration and Nationality Act made substantial alterations in many areas of immigration law, the Act's enforcement provision mirrored the language and structure of § 1 of the March Act enacted only a few months earlier. While Congress again made significant revisions to federal immigration law in the Immigration Reform and Control Act of 1986, Pub.L. No. 99–603, 100 Stat. 3359 (codified as amended in scattered sections of 8 U.S.C.), the proscribed offenses established in the Immigration and Control Act of 1952 remained in effect.[6]

The evolution of § 1324(a)(1) thus exhibits Congress' continuing efforts to strengthen federal anti-smuggling law by broadening the scope of proscribed conduct. From its genesis as a statute prohibiting only the bringing in of aliens, § 1324(a)(1) now presents a single comprehensive "definition" of the federal crime of alien smuggling—one which tracks smuggling and related activities from their earliest manifestations (inducing illegal entry and bringing in aliens) to continued operation and presence within the United States (transporting and harboring or concealing aliens).

Congressional efforts to generally broaden the scope of § 1324(a)(1), does not, however, lead to the conclusion that Congress necessarily intended thereby to impose

---

**4.** *See* 98 Cong.Rec. 798 (remarks of Sen. Humphrey) ("The [illegal immigration problem from Mexico] is not one which is produced as a result of people getting Mexicans on a train or a bus and bringing them across the border.... They walk across the Rio Grande, come into the United States and are lost in the population of the United States"), 1344 (remarks of Sen. Ellsworth), 1346–47 (remarks of Rep. Celler), 1352–53 (remarks of Rep. Fisher) (1952). While the March Act was not restricted, by its terms, to illegal immigration from Mexico, this issue monopolized congressional debate.

**5.** Addition of the bringing in and transport offenses to the list of proscribed conduct did not alter the existing scheme of penalties. The March Act merely created two additional statutory subsections, the violation of which, as with the two existing smuggling offenses, was subject to the section's single penalty provision.

**6.** Focusing primarily on the issues of employer sanctions and legalization of undocumented aliens, *see* Statement of President Ronald Reagan Upon Signing S. 1200, 22 Weekly Comp. of Pres.Doc. 1534 (Nov. 10, 1986), *reprinted in* 1986 U.S.Code Cong. and Admin.News 5856–1, the Immigration Reform and Control Act made no modifications to the text of the immigration enforcement provisions relevant to this appeal.

multiple penalties for multiple violations of its terms. On this point, the Supreme Court's decisions in *Prince v. United States*, 352 U.S. 322, 77 S.Ct. 403, 1 L.Ed.2d 370 (1957), and *Heflin v. United States*, 358 U.S. 415, 79 S.Ct. 451, 3 L.Ed.2d 407 (1959), which addressed the propriety of multiple penalties under the Federal Bank Robbery Act prove instructive.

Like § 1324(a)(1), the legislative history of the Federal Bank Robbery Act evidences ongoing congressional efforts to broaden the scope of proscribed conduct in the context of a single statutory provision. Enacted in 1934, the original Bank Robbery Act covered only robbery and other assaultive conduct in federally organized or insured banking institutions. A few years later, at the behest of the Attorney General, Congress addressed the apparent shortcomings in federal bank robbery law by amending the Act to include additional nonviolent property offenses. *Heflin*, 358 U.S. at 419, 79 S.Ct. at 453 (addition of receipt of stolen property offense); *Prince*, 352 U.S. at 325–26, 77 S.Ct. at 405–06 (addition of offense prohibiting entry of federal bank with intent to commit a crime).

Petitioners in both *Prince* and *Heflin* challenged the imposition of their respective multiple sentences under this revamped version of the Federal Bank Robbery Act. Based on their involvement in single bank robbery episodes, each of these petitioners had been convicted of multiple violations of the Act and had subsequently received consecutive prison terms for each of the offenses.[7] Rejecting the multiple penalties imposed on petitioners, the Court concluded in each case that Congress' tightening of the criminal ratchet against bank robbers did not signify a concomitant congressional intent to provide multiple punishments for multiple violations of the Federal Bank Robbery Act when committed in a single bank robbery. *Heflin*, 358 U.S. at 419–20, 79 S.Ct. at 453–54; *Prince*,

352 U.S. at 328, 77 S.Ct. at 406. As the *Heflin* Court noted:

> We find no purpose of Congress to pyramid penalties for lesser offenses following the robbery. It may be true that in logic those who divide up the loot following a robbery receive from robbers and thus multiply the offense. But in view of the legislative history of [the Federal Bank Robbery Act] we think Congress was trying to reach a new group of wrongdoers, not to multiply the offense of the bank robbers themselves.

*Heflin*, 358 U.S. at 419–420, 79 S.Ct. at 454.

■ As with the Federal Bank Robbery Act, we similarly discern from the legislative history of § 1324(a)(1) no congressional intent to pyramid the penalties for bringing in and transporting aliens when these offenses are committed simultaneously. Congress' apparent purpose in adding the transport offense to the other enumerated smuggling offenses in § 1324(a)(1) was to ensure that a "new group of wrongdoers" —persons transporting aliens within the United States—would not escape punishment simply because they had not also brought those aliens into the United States. Furthermore, the fact that Congress has, over the years, broadened the scope of § 1324(a)(1)'s predecessors while still retaining the same basic statutory framework of enumerated offenses followed by a single penalty provision, suggests that Congress did not by these various amendments and recodifications intend to create multiple punishments for each statutory violation. *Prince*, 352 U.S. at 328 & n. 10, (fact that amendments to the Federal Bank Robbery Act merely inserted additional offenses without altering existing penalty scheme persuasive evidence that Congress did not intend to impose multiple punishment for violations of multiple offenses under the statute). Accordingly, because we find the structure and legislative history of § 1324(a)(1) to be inconsistent with a congressional intent to multiply punishment, we decline to read § 1324(a)(1) as

---

7. In *Prince,* the petitioner's cumulative sentences were predicated on convictions for the offenses of robbery and entering a bank with intent to commit a felony. 352 U.S. at 324, 77

S.Ct. at 404. The petitioner in *Heflin* received multiple sentences for his aggravated robbery and receipt of stolen property convictions. 358 U.S. at 416, 79 S.Ct. at 452.

authorizing the multiplication of penalties for the offenses of bringing in and transporting aliens.[8]

### 2.

Our conclusion that Congress did not intend multiple punishment for violations of § 1324(a)(1)(A) and § 1324(a)(1)(B) also comports well with this circuit's rule, enunciated in *United States v. Palafox,* 764 F.2d 558 (1985) (en banc), which limits the circumstances under which multiple penalties can be properly imposed for offenses arising out of a singular criminal act or transaction.

*Palafox* involved a frustrated narcotics sale between an undercover agent and Palafox. While negotiating to buy a package of heroin, the agent asked Palafox for a sample. Palafox handed the package over to the agent, who, after removing a small quantity of the drug, promptly returned the package. Arrested almost immediately thereafter, Palafox was charged and convicted both of distributing the heroin sample and possessing the heroin in the package with intent to distribute. While noting the "strong congressional intent to criminalize all aspects of drug trafficking," *id.* at 560, we nonetheless held that only one punishment could be imposed as Congress did not intend to multiply the penalties for possessing and distributing narcotics when "each offense [was] committed at virtually the same time, in the same place, and with the same participants." *Id.* at 562.

The fact-specific nature of the *Palafox* test has engendered considerable disagreement concerning what is, and what is not, a single course of criminal conduct for purposes of multiple punishment principles. *Compare United States v. Safirstein,* 827 F.2d 1380, 1384 (9th Cir.1987) (false statement and failure to report transportation of more than $10,000 in currency distinct acts supporting multiple sentences) *and United States v. Palacios,* 835 F.2d 230, 233–34 (9th Cir.1987) (possessing and passing counterfeit bills separately punishable offenses when defendant passed 44 bills and retained 46 in his pants pocket) *with United States v. Wilson,* 781 F.2d 1438, 1440 (9th Cir.1986) (per curiam) (narcotics manufacturing offenses "all successive steps of one criminal undertaking" for which only one sentence could be imposed) *and United States v. Touw,* 769 F.2d 571, 574 (9th Cir.1985) ("single act" of attempting to purchase marijuana from undercover agents could not support multiple sentences for offenses of conspiracy to possess and attempted possession of a controlled substance).

Yet despite this lack of consensus with respect to the precise parameters of the *Palafox* test, we nonetheless conclude that Sanchez–Vargas' actions fit comfortably within the range of conduct for which *Palafox* forbids multiple punishment. Driving continuously from Mexico, through the boundary fence west of Otay Mesa, and into the United States until stopped by Agent Scott just a few miles from the border, Sanchez–Vargas necessarily committed the offenses of bringing in and transporting at virtually the same time and place. Sanchez–Vargas' conduct exhibited neither the temporal nor spatial distance characterizing our prior decisions upholding multiple penalties. *See United States v. Wolf,* 813 F.2d 970, 977 (9th Cir.1987)

---

**8.** Given this indication of congressional intent with respect to multiple punishments under § 1324(a)(1), we need not address the principles of statutory construction established in *Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932). *See Albernaz,* 450 U.S. at 340, 101 S.Ct. at 1143 ("The Blockburger test is 'rule of statutory construction' ... [which] should not be controlling where, for example, there is a clear indication of ... legislative intent."); *see also Hunter,* 459 U.S. at 366–68, 103 S.Ct. at 678–79. Moreover, the Supreme Court has not yet applied the *Blockburger* analysis to offenses contained within a single statutory section as opposed to multiple or scattered statu-

tory provisions. *Compare Albernaz,* 450 U.S. at 336, 101 S.Ct. at 1141 (applying *Blockburger* to "separate offenses with separate penalty provisions ... contained in distinct Subchapters of the [Drug Abuse Prevention and Control] Act") *and Gore v. United States,* 357 U.S. 386, 390–91, 78 S.Ct. 1280, 1283–84, 2 L.Ed.2d 1405 (1958) (*Blockburger* properly applied to offenses defined in separate statutory provisions with separate penalty provisions) *with Prince,* 352 U.S. at 327–28, 77 S.Ct. at 406–07 (relying on structure and history of act as sole evidence of congressional intent when interpreting penalty provision in single statutory section).

(stolen vehicle driven from Coronado to Ensenada over course of three days); *United States v. McQuisten,* 795 F.2d 858, 868 (9th Cir.1986) (manufacture and conspiracy to manufacture methamphetamines consisted of "several distinct criminal acts" including telephone calls and purchases of raw materials over several weeks); *United States v. Rodriguez–Ramirez,* 777 F.2d 454, 457–58 (9th Cir.1985) (narcotics sale spanning several days and occurring at several locations).

We need not speculate about how far down the road of criminality smugglers need travel before multiple penalties under § 1324(a)(1) become appropriate. For today, the road less traveled proves the wiser course. We merely hold that driving a car carrying an undocumented alien across the border at a point other than a designated point of entry until stopped by law enforcement authorities a few miles from the border simply is not the type of situation Congress intended to support multiple punishment under § 1324(a)(1).

### IV.

Having concluded that Sanchez–Vargas' criminal conduct constituted a single act or transaction for which both legislative history and *Palafox* counsel against multiple punishment under § 1324(a)(1), we turn finally to the appropriate disposition of his conviction and sentences. While properly charged and tried for bringing in and transporting an alien in violation of §§ 1324(a)(1)(A) and (B), Sanchez–Vargas can be convicted and sentenced for only one of these sentences. *Ball v. United States,* 470 U.S. 856, 864–65, 105 S.Ct. 1668, 1673–74, 84 L.Ed.2d 740 (1985); *Wilson,* 781 F.2d at 1440; *Touw,* 769 F.2d at 574; *Palafox,* 764 F.2d at 563–64. Accordingly, we vacate the judgment of the district court and remand with instructions to have the court exercise its discretion to stay entry of judgment and impose sentence on only one of the offenses.

AFFIRMED IN PART; VACATED IN PART; AND REMANDED.