BRISCOE, Circuit Judge,
dissenting:
I respectfully dissent. The outcome of this case is controlled by the applicable scope of review. A district court’s decision setting aside a jury verdict is entitled to no deference. United States v. Santistevan, 39 F.3d 250, 254 (10th Cir.1994). This court reviews a district court’s grant of a motion for acquittal de novo. United States v. Evans, 42 F.3d 586, 589 (10th Cir.1994). Specifically, this court views the evidence, both direct and circumstantial, in the light most favorable to the government and, without weighing conflicting evidence or considering the credibility of witnesses, determines whether that evidence, if believed, would establish each element of the crime. Id. If the government has met that standard, this *1451 court, as well as the district court, must defer to the jury’s verdict of guilty. Id. While the majority cites the correct scope of review, it, Mice the district court, ignores the applicable scope of review and views the evidence in the light most favorable to defendant. The evidence presented at trial is clearly sufficient, when viewed in the light most favorable to the government, to support defendant’s convictions for transporting illegal aliens, in violation of 8 U.S.C. § 1324(a)(l)(A)(ii). I would reverse the district court’s judgment of acquittal and remand with directions to reinstate the jury’s verdict.
I.
Before applying the applicable scope of review, we must first determine what the government must prove to satisfy the “in furtherance of’ element of the statute. The statute under which defendant was charged, 8 U.S.C. § 1324(a)(l)(A)(ii), makes it illegal for any person who
knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, transports, or moves or attempts to transport or move such alien within the United States by means of transportation or otherwise, in furtherance of such violation of law.
The statute was not intended to criminalize purely innocent conduct, such as, for example, “the actions of a cab driver who transports in a routine commercial transaction an individual who announces his illegal alien status during the course of the ride.” United States v. Parmelee, 42 F.3d 387, 391 (7th Cir.1994). Rather, “the transport offense was directed, in large part, at curbing the widespread practice of transporting illegal immigrants, already in the United States, to jobs and locations away from the border where immigration enforcement resources may have been more scarce.” United States v. Sanchez-Vargas, 878 F.2d 1163, 1169 (9th Cir.1989) (analyzing legislative history of statute).
To establish a violation of § 1324(a)(l)(A)(ii), the government must establish “(1) the transporting or moving of an alien within the United States, (2) that the alien was present in violation of law, (3) that the defendant was aware of the alien’s status, and (4) that the defendant acted willfully in furtherance of the alien’s violation of the law.” United States v. Diaz, 936 F.2d 786, 788 (5th Cir.1991) (listing elements for violation of § 1324(a)(1)(B), the predecessor statute to § 1324(a)(l)(A)(ii)); see United States v. Hernandez, 913 F.2d 568, 569 (8th Cir.1990) (same); see also Parmelee, 42 F.3d at 391 (“a defendant’s guilty knowledge that his transportation activity furthers an alien’s illegal presence in the United States is an essential element of the crime”). Only the final element is at issue in this appeal. Currently, there is disagreement among the circuits concerning how to interpret this final element, and three different approaches have been utilized.
Direct or substantial relationship approach
The first approach was adopted by the Ninth Circuit in United States v. Moreno, 561 F.2d 1321 (9th Cir.1977), in which a foreman for a reforestation company who transported workers from one job site to another was charged with violating 8 U.S.C. § 1324(a)(2) (a predecessor statute to § 1324(a)(l)(A)(ii)). Noting the defendant’s employment required him to transport the workers, the Ninth Circuit concluded the transportation “was only incidentally connected to the furtherance of the violation of law, if at all.” Id. at 1322. In order to satisfy the “in furtherance of’ element, the court held, “there must be a direct or substantial relationship between that transportation and its furtherance of the alien’s presence in the United States.” Id. at 1323. Although the Moreno court provided little guidance in how to determine when such a relationship exists, it did suggest factors such as the transportation’s “time, place, distance and overall impact” are relevant. Id.; see also United States v. One 1984, Ford Van, 826 F.2d 918, 919-20 (9th Cir.1987) (applying Moreno and holding “[tjransportation at remote jobsites” does not violate the statute).
Some courts that have subsequently adopted the “direct or substantial relationship” approach have indicated an alternative *1452 way of describing it is that the transportation of an illegal alien does not violate § 1324(a)(l)(A)(ii) if the transportation is only incidentally connected to furtherance of an alien’s violation of the law. See, e.g., United States v. Velasquez-Cruz, 929 F.2d 420 (8th Cir.1991). In Velasquez-Cruz, the defendant was an illegal alien who had applied for amnesty from the government. While in Los Angeles, defendant met six illegal aliens from Ecuador who, like defendant, were interested in moving to New York. The aliens pooled their money to buy a used car and a van and set out for New York. While defendant was driving the car through Arkansas, with some of the other aliens as passengers, she was stopped and eventually arrested for illegal alienage. Defendant was subsequently charged and convicted of willfully transporting aliens in violation of § 1324(a)(1)(B) (a predecessor statute). On appeal, defendant argued the evidence presented at trial was insufficient to demonstrate that she acted in furtherance of the aliens’ violation of the law. In particular, defendant argued “her transportation of illegal aliens was merely incidental to her own journey to New York, because she did not instigate the aliens’ plan to move or persuade them to do so, did not seek to conceal the aliens, did not sell the ear or receive the money for its sale, and shared the driving with other aliens.” Id. at 424. The Eighth Circuit rejected defendant’s arguments and concluded there was sufficient evidence to support her conviction. Specifically, the court noted there was substantial evidence to support the conclusion that defendant organized the aliens’ journey (e.g., by playing a key role in buying the ear, by directing at least some of the aliens to meet her at a safe house to begin the journey, and by being the sole or at least primary driver of the car). Id.
Intent-based approach
The Sixth Circuit has expressly rejected the “direct or substantial relationship” approach on the grounds that it “is unable to distinguish between someone who knowingly smuggles illegal aliens across the country from someone who knowingly gives an illegal alien a ride to a shelter for the homeless.” United States v.1982 Ford Pick-Up, 873 F.2d 947, 951 (6th Cir.1989). In its place, the Sixth Circuit adopted an “intent-based” approach which purportedly focuses on the intent of the person accused of transporting illegal aliens. Under this approach, the fact finder is directed to consider all evidence it finds credible about the defendant’s intentions. As examples, the Sixth Circuit noted a fact finder may “look to see whether the defendant was compensated for the transportation,” “what efforts the defendant took to conceal or harbor the illegal aliens,” and “whether the illegal aliens were friends, coworkers, or companions of the defendant, or merely human cargo that was being shipped.” Id.
In 1982 Ford, two pickup trucks owned by Juana and Luis Mendoza were seized by INS because of alleged use in transporting illegal aliens in violation of § 1324(a)(1)(B). More specifically, it was uncontroverted the Men-dozas had used the trucks to transport citizens of El Salvador, all of whom were friends, relatives, and former co-workers of the Mendozas, from Dallas, Texas, to Covington, Kentucky, for the admitted purpose of helping them obtain construction jobs (Luis Mendoza owned a construction company and had relocated it from Dallas to Covington). Purportedly applying its intent-based approach, a divided panel concluded “that the Mendozas’ actions were quite innocent.” Id. at 952. More specifically, the two members of the majority noted (1) the Mendozas made no attempt to hide their passengers or otherwise conceal the fact they were illegal aliens, (2) the Mendozas received no financial remuneration for their actions, (3) the illegal aliens were friends, relatives, and co-workers of the Mendozas, (4) the aliens sought transportation to Kentucky to find employment and not to escape prosecution or otherwise evade the law, and (5) the Mendozas’ purpose “was to promote the well-being of friends and relatives by helping them obtain employment.” Id[3]
General approaches
The Fifth Circuit appears to have implicitly adopted a more general approach that *1453 utilizes the Ninth Circuit’s “direct or substantial relationship” approach, but also focuses on the intent of the defendant in transporting aliens.[4] United States v. Merkt, 764 F.2d 266, 271-72 (5th Cir.1985). In determining the defendant’s intent, the Fifth Circuit has stated a jury “should be instructed to consider all of the evidence it finds credible about [a defendant’s] intentions, direct as well as circumstantial, such as the mode of transportation used, the time of travel, the route chosen, ... and the distance from the border at the time of apprehension.” Id. at 272.
In Parmelee, the Seventh Circuit acknowledged both the “direct or substantial relationship” and “intent-based” approaches, but refused to adopt either for purposes of determining a defendant’s guilty knowledge that his transportation activity furthers an alien’s illegal presence in the United States. 42 F.3d at 391. In doing so, the Seventh Circuit stated:
As in other criminal prosecutions that require mens rea, the government may prove the defendant’s knowledge by reference to the facts and the circumstances surrounding the case. Relevant considerations bearing on this issue include whether the defendant received compensation for his transportation activity, whether the defendant took precautionary efforts to conceal the illegal aliens, and whether the illegal aliens were the defendant’s friends or coworkers or merely human cargo.
Id.[5] (internal citations omitted).
Tenth Circuit approach
This court has never expressly adopted or rejected any of the above-listed approaches for determining the “in furtherance of’ element. It has, however, previously discussed the element on two separate occasions. In United States v. Perez-Gomez, 638 F.2d 215 (10th Cir.1981), the defendant was arrested in Hays, Kansas, after INS agents (who had been advised defendant was transporting illegal aliens from Los Angeles to Chicago) observed him walk from a motel room to a nearby restaurant, order thirty-two hamburgers and sixteen orders of fries to go, return with the food to two motel rooms, and later escort nineteen people from the rooms to a van parked nearby. After being charged and convicted of transporting illegal aliens, defendant appealed and contended the evidence presented at trial was insufficient to establish the transportation was in furtherance of the aliens’ illegal presence. In rejecting this argument, the court cited Moreno and held “the transportation of [nineteen] aliens from Los Angeles to Kansas, en route to Chicago, sufficiently further[ed] the aliens’ illegal presence in the United States to meet the requirements of the statute.” Id. at 219. Although the court mentioned other factors (e.g., the aliens had crossed the border within days of their cross-country journey, none of the aliens knew defendant’s name, the aliens were transported from Los Angeles to Hays without an opportunity to eat or leave the van, and the van had a special partition to prevent outsiders from observing the cargo), it is unclear whether the court considered those factors relevant to the “in furtherance of’ element, to defendant’s knowledge that his passengers were illegal aliens (an element which the defendant also challenged on appeal), or to both. Id.
Thirteen years later, in United States v. Chavez-Palacios, 30 F.3d 1290, 1294 (10th *1454 Cir.1994), this court again acknowledged Moreno in noting “that mere transportation of an illegal alien is, without more, insufficient as a matter of law to support a conviction under this statute.” In Chavez-Palacios, this court held the “in furtherance of’ requirement was satisfied where the defendant was driving a van in New Mexico, en route to Denver, carrying several illegal aliens “so that the aliens could attempt to find work there.” Id. Although the court noted the aliens were lying down in the rear of the van when it was stopped by authorities, there is no mention of any additional factors (e.g., defendant’s receipt of money for transporting aliens, whether defendant knew the aliens, etc.).
Reviewing these two cases together, I believe this court has implicitly adopted a general approach, similar to that of the Fifth or Seventh Circuits. Although the court has expressly cited the Ninth Circuit’s “direct or substantial” relationship test, it has also implicitly approved of a jury considering all credible evidence concerning the defendant’s intentions.
The majority’s approach
Unfortunately, the majority erroneously suggests only three factors (i.e., profit, active concealment, and “human cargo”) are relevant in determining whether transportation occurred “in furtherance of’ an illegal alien’s presence within the United States. Not only does this approach ignore circuit precedent, it effectively limits the intended reach of the statute, and ignores the very problems to which the statute was intended to respond. Although it is obviously not uncommon to find situations (such as Perez-Gomez) in which a person is simply transporting illegal aliens to make a profit, it is undoubtedly more common to find situations in which a person agrees to transport an acquaintance, friend, or relative who is an illegal alien to other parts of the country to enable that person to find work and/or evade immigration authorities. In the latter situation, the transporter has as much, if not more, of an intent to further the illegal alien’s presence in this country than does the transporter in the former situation. Because of this greater personal interest, it is likely the transporter in the latter situation will be willing to do so without pay. For these reasons, I believe the general approach, which allows the fact finder to consider any and all relevant evidence of intent (e.g., time, place, distance, reason for trip, overall impact of trip, defendant’s role in organizing and/or carrying out the trip, etc.), is the proper one.
II.
At trial, the government presented the testimony of various witnesses, including two INS agents, Joseph Garcia and Steve Abla, who interviewed defendant after his arrest, and the two illegal aliens defendant was charged with transporting, Arturo Lopez-Arellano and Jesus Macias-Lopez. Defendant testified on his own behalf, and also presented the testimony of two relatives. Not surprisingly, the jury was ultimately faced with conflicting evidence about what transpired.
Garcia testified the truck defendant was driving had a camper shell with windows that had been painted dark, and, in his experience, older trucks with camper shells were used extensively for alien smuggling. Garcia further testified such camper shells usually have darkened or curtained windows to hide the illegal aliens. Both Garcia and Abla, who worked with Garcia at the checkpoint, testified defendant waived his rights after the arrest and told them he was charging the other people in the truck approximately $300 per person to transport them to Denver. When the truck was stopped, another man and a woman were in the cab with defendant, and eight people (men, women, and children) were lying in the back of the truck. All of the occupants were determined to be illegal aliens. According to Abla, defendant stated he had met the illegal aliens at a motel in the Phoenix area.
Lopez-Arellano testified defendant was a friend of his, and was also his brother-in-law’s brother-in-law. According to Lopez-Arellano, both he and defendant had been fired from their employment for not having papers and, after discussing the situation, they decided to travel to either Denver or Oregon to find work. Shortly thereafter, *1455 defendant traveled to Phoenix and, upon his return, told Lopez-Arellano it would be better if they traveled to Denver. Lopez testified defendant offered to drive his truck to Denver and, in return, Lopez-Arellano agreed to pay for gasoline. Lopez-Arellano further testified he and defendant left Prescott, Arizona (where Lopez-Arellano was living) in defendant’s truck and drove to Phoenix. At Phoenix, defendant drove to a house or hotel, went inside, and returned with the other people (most of whom Lopez-Arellano did not know), who got into the truck. According to Lopez-Arellano, they refueled and continued driving toward Denver. At Flagstaff, Arizona, they stopped to eat at a fast-food restaurant, and then continued until they reached the checkpoint where they were stopped. Lopez-Arellano testified he had initially lied to INS agents and told them he paid $300 to be smuggled into the United States and paid defendant $250 for the trip to Denver. Lopez-Arellano further testified he told the government the “truth” on the day prior to trial.
Macias-Lopez testified he walked across the Mexico-United States border at Del Monte, caught a ride with someone, and eventually took a taxi to a hotel in Phoenix. Macias-Lopez testified he arrived at the hotel early on a Friday morning. He subsequently met and talked to defendant in the lobby of the hotel. Defendant asked if Macias-Lopez and his brother (it is unclear whether Macias-Lopez traveled with his brother across the border or simply met his brother at the hotel) wanted to go to Denver, and asked if Macias-Lopez had any money. Macias-Lopez testified he gave defendant $150 to buy a vehicle (Macias-Lopez’ testimony on this point is unclear), and that his brother gave defendant money for the trip as well. Macias-Lopez testified he had never met defendant prior to the trip, and did not know anyone in the pickup other than his brother (with the exception of Lopez-Arella-no whom he allegedly encountered in a park in Prescott, Arizona, on the Friday afternoon after he arrived at the hotel). Macias-Lopez’ description of the trip at trial was the same as the description he gave to Garcia at the time he was arrested.
Defendant testified he was born in Mexico and entered the United States illegally in 1983. Since that time he has lived and worked in different locations in Arizona and Oregon. In December 1995, he was working in Arizona when he lost his job due to his illegal alien status. He contemplated returning to Oregon to find work. However, he talked with some friends in Phoenix about his situation and a man named Pedro Ramona told him there were good opportunities in Denver. Defendant testified that he agreed to take Ramona and his family (wife and two children) to Denver in return for them finding defendant a place to stay until he found work. Defendant testified that when he later told Lopez-Arellano about his plan to go to Denver, Lopez-Arellano expressed interest in going as well, and wanted to take along two friends who were familiar with Denver and could help them find work. Defendant testified that on the day of the trip, he picked up Lopez-Arellano and the two Macias-Lopez brothers in Prescott, Arizona, then drove to Phoenix where he picked up Ramona and his family at their apartment. At Ramona’s apartment, Ramona told defendant there were three more people who wanted to go to Denver. Defendant agreed to allow the three additional people to ride with them. Defendant testified they refueled and ate in Flagstaff before continuing to the checkpoint. According to defendant, he received a total of $150 from Lopez-Arellano and the two Macias-Lopez brothers in Prescott, and a total of $250 from the other people in the truck who loaded in Phoenix. Defendant testified that at the time of his arrest, he had approximately $500 in cash (which included $140 of his own which he took with him when he left).
Viewing the evidence in the light most favorable to the government, I conclude it is more than sufficient to satisfy the “in furtherance of’ element with respect to defendant’s transportation of both Lopez-Arellano and Macias-Lopez. It is uncontroverted that defendant planned and organized the trip to Denver, a city much farther away from the Mexico-United States border than Prescott or Phoenix, so that he, Lopez-Arellano, and Macias-Lopez could look for work. It is further uncontroverted that in carrying out the trip, defendant utilized a vehicle com *1456 monly associated with the illegal transportation of illegal aliens, i.e., a pickup truck and a camper shell with darkened windows. It is uncontroverted that the majority of the aliens (including Macias-Lopez and, for part of the trip, Lopez-Arellano) rode inside the camper shell and were lying down at the time the truck reached the checkpoint. It is also uncontroverted that defendant was driving through the night and was stopped at the checkpoint in the early morning hours. All of these basic facts, viewed in the light most favorable to the government, suggest defendant was acting in willful furtherance of Lopez-Arellano’s and Macias-Lopez’ illegal presence in this country.
With respect to Lopez-Arellano specifically, the only controverted fact of importance is whether Lopez-Arellano paid defendant to take him to Denver, or whether Lopez-Arel-lano merely paid for gas when they refueled the pickup in Flagstaff. Viewing the evidence in the light most favorable to the government, the jury could have reasonably believed Lopez-Arellano was lying at trial and had actually paid defendant for the trip. Both agent Garcia and agent Abla testified defendant told them he was charging $300 per person to transport the truck’s occupants to Denver. Although Lopez-Arellano was a friend of the defendant, this does not necessarily preclude a finding that defendant acted in furtherance of Lopez’ illegal presence in this country.
With respect to Macias-Lopez, it is controverted whether he began riding with defendant in Prescott, Arizona, or whether he met defendant at a motel in Phoenix and agreed to pay him for a ride to Denver. Viewing the evidence in the light most favorable to the government, the jury could have reasonably believed the latter story. Either way, it is uncontroverted that Macias-Lopez paid defendant some amount of money for the ride. Further, it is uncontroverted that Macias-Lopez was, at best, a mere acquaintance of defendant. Thus, the jury could have reasonably concluded Macias-Lopez was “human cargo.”
In the end, the facts of this case fall somewhere between those of Perez-Gomez and Chavez-Palacios. Specifically, the facts are arguably less egregious than Perez-Gomez because defendant knew one of the aliens (Lopez-Arellano), and because he did not keep the aliens locked up in his vehicle for long periods of time without food, water, or bathroom breaks. However, the facts are arguably more egregious than Chavez-Palac-ios in that defendant received money from the aliens (one of whom was not his friend or co-worker) for transporting them to Denver (in Chavez-Palacios, it is unclear whether the defendant received any money, or whether the defendant knew the people he was transporting). Accordingly, it is entirely consistent with circuit precedent to conclude there was sufficient evidence to support defendant’s convictions.
Even if we were to believe defendant’s version of the facts, the evidence would still demonstrate that he was an “organizer” of the trip, and thus acted “in furtherance of’ the other aliens’ presence in this country, consistent with the Eighth Circuit’s holding in Velasquez-Cruz. Specifically, defendant researched two possible destinations (Oregon and Denver) and determined Denver would have the best employment opportunities for himself and the other aliens. Further, defendant offered to use his truck to transport everyone from Arizona to Denver. In return, defendant received compensation in various forms (e.g., cash from some of the aliens, payment for gas from others, and payment in the form of a place to live). Finally, defendant was the sole driver of the truck.
In reversing defendant’s convictions, the district court essentially viewed the evidence in the light most favorable to the defendant. For example, the district court concluded Lopez-Arellano contributed only $50 for gasoline, and did not otherwise pay defendant for the trip. Further, the district court acknowledged Macias-Lopez paid defendant $150 for the trip, but nevertheless concluded defendant did not profit from this because defendant’s transportation expenses included “insurance, licensing, taxes, oil, gasoline and wear and tear on the vehicle.” District Court’s Opinion at 5. The district court also acknowledged the camper shell windows were darkened, but nevertheless concluded *1457 there was no concealment or harboring, in part because the camper windows were darkened when defendant purchased the camper. Finally, the court concluded Macias-Lopez was not human cargo because he was an acquaintance of Lopez-Arellano. Unfortunately, the majority does the very same thing in affirming the district court’s decision.[6]
III.
For the reasons outlined above, I would reverse the district court’s judgment of acquittal and remand with directions to reinstate the jury’s verdict.

. The remaining panel member in 1982 Ford filed a dissenting opinion which I find, at least in *1453 part, more persuasive than the majority opinion. In particular, the dissent criticized the majority's application of the intent-based approach, noting that by transporting the aliens to Kentucky for purposes of obtaining construction jobs, the "defendants clearly intended to further the aliens’ illegal presence.” 873 F.2d at 952.

. Although the Sixth Circuit in 1982 Ford PickUp stated the Fifth Circuit in Merkt had utilized only an intent-based approach, this is incorrect. The Fifth Circuit expressly acknowledged and relied on the Ninth Circuit's direct or substantial relationship approach as well. 764 F.2d at 271-72.

. I do not read the "relevant considerations” listed by the Seventh Circuit as exclusive deter-minatives of guilty knowledge. Surely, a defendant can intend to further an illegal alien's presence in this country even though he or she receives no money for doing so, is a friend or relative of the alien’s, and takes little or no precautionary efforts to conceal the alien during transportation.

. Although the majority initially cites the proper de novo standard of review, it proceeds in section II.A. of the opinion to determine whether the district court's “factual findings” were in "error." Clearly, there are no “factual findings” to review in this case, nor is the district court’s view of the evidence entitled to any deference. Rather, our role on appeal is to view the evidence in the light most favorable to the government and determine whether the jury could have reasonably found the "in furtherance of” element.