**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
　　　　　　　*Plaintiff-Appellee,*

　　　　v.

ANGELICA LOPEZ,
　　　　　　　*Defendant-Appellant.*

No. 05-50415

D.C. No.
CR-04-01648-BTM

OPINION

Appeal from the United States District Court
for the Southern District of California
Barry T. Moskowitz, District Judge, Presiding

Argued and Submitted En Banc
December 12, 2006—San Francisco, California

Filed May 7, 2007

Before: Mary M. Schroeder, Chief Circuit Judge,
Harry Pregerson, Stephen Reinhardt, Alex Kozinski,
Michael Daly Hawkins, Sidney R. Thomas, Susan P. Graber,
Ronald M. Gould, Marsha S. Berzon, Richard C. Tallman,
Johnnie B. Rawlinson, Richard R. Clifton,
Consuelo M. Callahan, Carlos T. Bea, and
Milan D. Smith, Jr., Circuit Judges.

Opinion by Judge Reinhardt;
Concurrence by Judge Bea;
Dissent by Judge Tallman

**COUNSEL**

Steven F. Hubachek, Federal Defenders of San Diego, Inc., San Diego, California, for the defendant-appellant.

Jason A. Forge and Christopher P. Tenorio, Assistant United States Attorneys, San Diego, California, for the plaintiff-appellee.

**OPINION**

REINHARDT, Circuit Judge:

**I**

The issue before us is whether a driver who transports a group of illegal aliens from a drop-off point in the United States to another destination in this country commits only the offense of transporting aliens "within" the United States or

whether that individual is also guilty of the additional offense of aiding and abetting the crime of "bringing" the aliens "to" the United States. *See* 8 U.S.C. §§ 1324(a)(1)(A)(ii) and 1324(a)(2) (2000);[1] 18 U.S.C. § 2 (2000). In this case, the answer depends on the point at which the crime of "bringing to" terminates. We hold that although all of the elements of the "bringing to" offense are satisfied once the aliens cross the border, the crime does not terminate until the initial transporter who brings the aliens to the United States ceases to transport them — in other words, the offense continues until the initial transporter drops off the aliens on the U.S. side of the border. At that point the offense ends, regardless of the judicial district in which the termination occurs. Because, here, the defendant transported undocumented aliens only within the United States and did so only after the initial transporter had dropped the aliens off inside the country, and because there is insufficient evidence to establish that the defendant otherwise aided and abetted the initial transportation, we reverse the convictions on the "bringing to" offense. § 1324(a)(2); 18 U.S.C. § 2.

No question is raised by the defendant regarding the applicability of the "transports within the United States" statute to her act of transporting undocumented aliens from one location within the United States to another. Because we took this case en banc without a three-judge panel decision in order to bring consistency to our circuit law with respect to the scope and meaning of the pertinent provisions of § 1324,[2] we do not consider the questions the defendant raises relating to the admissibility of certain depositions and statements, but refer

---

[1]All citations to 8 U.S.C. § 1324 are to the 2000 edition of the United States Code. Section 1324 has been amended since 2000 but none of the amendments is relevant to our decision. We use the terms "brings to" and "bringing to" interchangeably when referring to the offense proscribed by § 1324(a)(2).

[2]*See United States v. Gonzalez-Torres*, 309 F.3d 594 (9th Cir. 2002); *United States v. Ramirez-Martinez*, 273 F.3d 903 (9th Cir. 2001); *United States v. Angwin*, 271 F.3d 786 (9th Cir. 2001).

those issues to the three-judge panel.[3] Should the panel reject the defendant's arguments on those points, it should affirm the "transports within" convictions. In any event, we here reverse the convictions on the "bringing to" counts.

## II

At approximately 6:00 p.m. on June 1, 2004, United States Border Patrol agents stopped a vehicle on Interstate 8 in eastern San Diego County, California, that contained a driver, Angelica Lopez, and 12 passengers. After questioning the passengers, the agents arrested Lopez and brought her, along with the others, to a Border Patrol station roughly 10 miles away. Lopez was later indicted on three counts of bringing an undocumented alien to the United States for financial gain, in violation of 8 U.S.C. § 1324(a)(2)(B)(ii), and aiding and abetting, in violation of 18 U.S.C. § 2, as well as three counts of transporting an undocumented alien within the United States, in violation of 8 U.S.C. § 1324(a)(1)(A)(ii), and aiding and abetting, in violation of 8 U.S.C. § 1324(a)(1)(A)(v)(II). The details of the June 1 incident were disputed at Lopez's four-day jury trial. However, for purposes of this opinion, because she was convicted on all counts, we accept the government's version of the facts as correct.

Border Patrol Agent Eric Huber testified that, on June 1, he and his partner observed Lopez's vehicle, a white Ford Expedition, enter the freeway from Buckman Springs Road. According to Huber, the Expedition bounced in a distinctive fashion that suggested that it might be carrying an unusually heavy load. The agents pulled their patrol van alongside Lopez's vehicle and Huber peered inside. He observed what

---

[3]We take an entire case en banc, and not merely a single issue. The en banc court may choose, however, to resolve all the issues presented by a case or instead to decide only the issue or issues that precipitated the convening of the en banc court and to refer other questions back to the three-judge panel.

he believed to be several persons lying on the floor in the back of the SUV. Huber testified that at that point Lopez slowed her vehicle drastically. The agents ran its license plates and determined that it was registered to "Angelica Lopez." The agents then activated their emergency lights and effected the stop.

Huber testified at length about statements Lopez allegedly made to him at the Border Patrol station. According to Huber, Lopez told him that earlier that day she had spoken by telephone with an individual named "Jose," and had made arrangements with him to pick up the persons later found in the Expedition. Lopez also gave Huber a vague physical description of Jose. Jose had instructed Lopez, Huber testified, to drive to the area where the agents first observed her, where she would find a sweater in the road; the sweater would mark the meeting place where Lopez would meet her passengers. She was then to transport them to a gas station in El Centro, where she would be paid $500. Huber testified that Lopez told him that she believed that her passengers were in the country illegally, and that he verified that none of the passengers was in fact legally present in the United States.

After Huber, the government called as material witnesses two of the passengers named in Lopez's indictment, Olga Barrios-De Leon and her husband, Miguel Angel Osorio-Hernandez. Barrios testified that she is a Guatemalan citizen who did not have documentation permitting her to enter the United States. She explained that she and Osorio traveled to Tijuana, Mexico, where they made arrangements to be taken to Los Angeles for $1,500 each. The couple took a bus to Tecate, Mexico, from which point a guide walked them, along with 18 other persons, through the hills and into the United States, a journey that lasted two days and nights. The guide left the group in the hills with instructions to wait until someone came to pick them up. A vehicle came shortly thereafter, but it was stopped by immigration officials, who also seized eight individuals from Barrios and Osorio's group. The

remaining 12, including the couple, stayed hidden in the hills. Around this time, Barrios began to menstruate and blood became visible on the outside of her pants. The following day the entire group, concerned for Barrios's health, moved from the hills to the road to seek assistance. According to Barrios, all 12 individuals were visible from the road at this point. About an hour after they moved to the roadside — and a total of one night and one day after the guide had left them in the hills — Barrios and the 11 others were picked up by Lopez. Osorio, who took the stand after Barrios, gave testimony consistent with his wife's. He added that Lopez had told the passengers "to tell the truth if she was stopped, or if she was apprehended," and that she had told them all "to duck."

The third material witness named in the indictment, Miguel Lopez-Villagres, was not present at Lopez's trial. Over Lopez's objection, the trial judge permitted the government to offer his deposition testimony. That testimony stated that Lopez-Villagres is a Guatemalan citizen without documentation to enter the United States. His account of the events surrounding the June 1 incident was consistent with Barrios and Osorio's and included similar details. According to Lopez-Villagres, when the individuals climbed into Lopez's vehicle, she told them, "Just get in there and make yourselves comfortable so that all of you can fit in." Some time later she added, "Don't blame me if we're stopped."

The district court denied Lopez's motion for acquittal at the close of the government's case. Lopez then took the stand on her own behalf. She testified that she lived in Pomona with her parents and three children and paid no rent. At the time of trial, she said, she had two jobs — one as a floral designer and one as a teacher at a fabric store. Lopez explained how she acquired the Expedition she was driving on June 1. She testified that some time earlier she saw the vehicle sporting a "for sale" sign in a restaurant parking lot and that she called the owner from a public phone. When she followed up on May 28, the owner informed her that the car had been moved

to an impound lot in San Diego County. Lopez tendered payment and she and the owner registered the vehicle in her name that day.

On June 1, according to Lopez, a friend gave her a ride to the impound lot, two and a half hours from Pomona, to retrieve the car. The vehicle had no fuel, so Lopez stopped at a gas station before heading back toward the freeway. She became lost, however, as she had on her way to the impound lot as well. Lopez mistakenly entered the eastbound side of the highway. There, she saw two men on the side of road, waving "like they looked desperate, like they needed help." As she drove closer, she saw a woman with blood on her pants. Lopez testified that she had offered roadside assistance to strangers in the past, and that she stopped to do so on June 1. She said that the bleeding woman's husband told her that his wife needed help because she was "hemorrhaging." Lopez volunteered to take the husband and wife "to the nearest place so they can get help for her"; when the couple got into Lopez's car, however, the other 10 individuals from the group followed. Lopez testified that she was not concerned with the passengers' immigration status because she was concerned about helping the bleeding woman — as Lopez put it, "you don't ask somebody for documents when you are helping them." Lopez drove for about 10 minutes before the Border Patrol pulled her over. She denied braking when the Border Patrol vehicle pulled up alongside her.

The agent who stopped Lopez took her keys and began speaking to the passengers; because she was "told to be quiet," Lopez had no chance to explain to him about the bleeding woman until much later, when she was in custody at the Border Patrol station.[4] Lopez denied telling Huber the "Jose" story and denied making the statements in the vehicle that Osorio and Lopez-Villagres attributed to her. Lopez also

---

[4]On rebuttal, Agent Huber testified that Lopez never, even at the Border Patrol station, mentioned that she was trying to help Barrios.

called as a witness her sister, who testified that Lopez had lent roadside assistance to strangers in the past.

At the end of the testimony, Lopez renewed her motion for acquittal and the district court again denied the motion. The jury convicted Lopez on all six counts. Lopez filed post-trial motions for a judgment of acquittal and a new trial. The district court denied these motions after a hearing. The district court sentenced Lopez to a mandatory minimum term of five years in prison, to be followed by two years of supervised release. *See* § 1324(a)(2)(B) (establishing penalties). She now appeals, challenging, *inter alia*, the sufficiency of the evidence to support her convictions for the three "brings to" offenses.

## III

### A.

**[1]** In 8 U.S.C. § 1324, Congress created several discrete immigration offenses, including: (1) bringing an alien to the United States; (2) transporting or moving an illegal alien within the United States; (3) harboring or concealing an illegal alien within the United States; and (4) encouraging or inducing an illegal alien to enter the United States. We consider here the scope and meaning of the first of these offenses, codified in § 1324(a)(2), which creates criminal liability for "[a]ny person who, knowing or in reckless disregard of the fact that an alien has not received prior official authorization to come to, enter, or reside in the United States, *brings to* . . . the United States in any manner whatsoever, such alien." (Emphasis added.)

The government advocates two theories of liability for holding that Lopez aided and abetted a "brings to" offense. First, because of the elementary rule that a defendant may not be convicted of aiding and abetting a completed offense, *see United States v. Nelson*, 137 F.3d 1094, 1104-05 (9th Cir.

1998), the government argues that a "brings to" offense that commences outside the United States does not terminate until the aliens reach their "immediate destination" in the United States.[5] In this case, the government contends that the immediate destination was Los Angeles. Under the government's theory, any person who transports the aliens before they reach their ultimate destination, even if that transportation occurs solely within the United States, has assisted in the commission of the "brings to" offense and may be held liable, on that evidence alone, for aiding and abetting that offense. Second, the government argues that, even if the "brings to" offense terminates at some earlier point, before the aliens reach their "intended destination" and before the defendant commences her transportation of them, aiding and abetting liability was established by its showing that prior to the termination of the offense the defendant acted in a fashion that enabled or encouraged others to commit that offense. The government contends that Lopez's convictions are sustainable on either theory. We conclude that they are sustainable on neither. We reject the government's first theory as a matter of law and the second as a matter of fact.

[2] The crux of this case is our determination of when the offense of bringing an alien to the United States terminates. We hold that it ends when the person who transports the aliens to the country terminates his act of transportation and drops off the aliens in the United States.[6] In so holding, we

---

[5]At various points in its filings before this court, the government employs the terms "immediate destination," "final destination," "ultimate destination," and "intended destination" interchangeably. Accordingly, throughout our opinion, we use the terms interchangeably as well.

[6]In some cases, accompanying or escorting an alien to the United States on a plane or by foot, or arranging for the alien's transportation — rather than driving the alien — will be sufficient to support a finding that the defendant violated § 1324(a)(2). *See, e.g.*, *United States v. Aguilar*, 883 F.2d 662, 683-84 (9th Cir. 1989) (upholding a "brings into" conviction in which the defendant procured false papers for the 13-year-old alien,

overrule any of our prior decisions that adopt or suggest a different rule. In particular, we reject the "immediate destination" (or ultimate destination) test set forth in *United States v. Ramirez-Martinez*.[7] Although there are a number of plausible constructions of § 1324(a)(2), the construction we adopt today is the one most consistent with the statute's text, structure, history, and purpose.

### B.

In construing § 1324(a)(2), the first issue we must consider is whether the "brings to" offense terminates as soon as its elements are met — as soon as the alien is brought "to" the United States — or whether instead the statute covers some conduct engaged in after the act of entry. We have held that ordinarily "[a] crime is complete when each element of the crime has occurred." *United States v. Smith*, 740 F.2d 734, 736 (9th Cir. 1984). In this case, each element has occurred as soon as the undocumented alien is brought "to" the United States — as soon as the alien reaches or crosses the border.[8] It would be a plausible reading, therefore, to conclude that the "brings to" offense terminates at that point. One might argue, reasonably, that although the pre-1986 version of § 1324(a)(2)

---

coached her to lie to immigration authorities, walked ahead of her through immigration, and met up with her immediately thereafter), *superseded by statute on other grounds as stated in Gonzalez-Torres*, 309 F.3d at 599; *see also infra* pp. 5015-16 (discussing other possible forms of offense conduct).

[7] In that decision, we adopted the "immediate destination" (ultimate or intended destination) theory that the government currently urges. We held that a "brings to" offense does not terminate until the aliens reach their "immediate destination" within the United States, and that anyone who transports the aliens within the United States before that point has, based on that conduct alone, aided and abetted the "brings to" crime. *See Ramirez-Martinez*, 273 F.3d at 912.

[8] Throughout this opinion, our discussion assumes that the other elements of § 1324(a)(2), including the alienage and lack of authorization of the person transported, as well as the defendant's *mens rea*, are satisfied.

prohibited bringing an alien "into" the United States — which appears to criminalize at least some conduct *within* the United States — the current version of the statute bans only bringing an alien "to" the United States, and thus does not criminalize any conduct after the point at which the alien enters the country. Such a reading, which views the 1986 amendment as a narrowing one, conflicts, however, with the legislative history we discussed in *Gonzalez-Torres*. *See* 309 F.3d at 599. There we pointed out that Congress passed the 1986 amendment in order to cover conduct previously not covered — that the amendment was intended to overrule case law requiring a completed legal "entry" to sustain a "brings into" conviction. *Id.*[9] It is clear from this history that the 1986 amendment was a broadening amendment — designed to cover conduct not subject to the earlier version — and not a narrowing one. Accordingly, the history and purpose of the statute do not support the conclusion that the offense terminates as soon as the alien is brought "to" the United States.

**[3]** On the contrary, for four reasons we conclude that the "brings to" offense continues after entry and does not terminate merely because all of the elements are met. First, the "brings to" offense proscribes an act that is not a static or an instantaneous occurrence, geographically or temporally.

---

[9]The change was made in response to a Southern District of Florida decision that had construed "brings into" as synonymous with "entering." *See United States v. Villanueva*, 408 F.3d 193, 198 (5th Cir.) (discussing history), *cert. denied*, 126 S. Ct. 268 (2005). "Entering" requires more than physical entry, however — it requires freedom from all official restraint, including from surveillance by government agents. *Gonzalez-Torres*, 309 F.3d at 598. Thus, under the prior statutory wording, a person who physically transported aliens across the border could have avoided prosecution under the subsection "if the immigrants he transported were not allowed entry into the United States" — for example, if those aliens were never free from government surveillance from the time they crossed the border until the time they were arrested in the United States. *Villanueva*, 408 F.3d at 198 (citing *United States v. Anaya*, 509 F. Supp. 289, 297 (S.D. Fla. 1980) (en banc), *aff'd on other grounds sub nom. United States v. Zayas-Morales*, 685 F.2d 1272 (11th Cir. 1982)).

Bringing aliens to the United States requires transporting them over a period of time and distance and thus does not occur at one particular moment or location. We have held, for instance, that the offense of transporting illegal aliens continues during the duration of the act of transportation. *See United States v. Covarrubias*, 179 F.3d 1219, 1225 (9th Cir. 1999), *abrogated on other grounds by Texas v. Cobb*, 532 U.S. 162, 168 & n.1 (2001); *see also United States v. Dinkane*, 17 F.3d 1192, 1199 (9th Cir. 1994) (holding that bank robbery continues throughout the period of hot pursuit). This result is also consistent with the "continuing offense" doctrine the Supreme Court announced in *Toussie v. United States*, 397 U.S. 112 (1970). *See id.* at 115, 120 (holding that an offense is "continuing" for statute of limitations purposes when "the nature of the crime involved" requires as much, such as when the offense "clearly contemplates a prolonged course of conduct").

[4] The second reason supporting our conclusion that the "brings to" offense continues after entry is that the federal venue statute, 18 U.S.C. § 3237 (2000), states that "[a]ny offense involving . . . transportation in interstate or foreign commerce, or the importation of an object or person into the United States is a continuing offense and . . . may be inquired of and prosecuted in any district from, through, or into which such commerce . . . or imported object or person moves." Lopez argues that § 3237 does not apply to § 1324(a)(2), which criminalizes bringing an alien *to* the United States, not *into* the United States. *Cf. Gonzalez-Torres*, 309 F.3d at 599 (discussing the distinction between "to" and "into"). It is true that, under *Gonzalez-Torres*, one can violate § 1324(a)(2) without "entering" the United States in a legal sense. *See supra* note 10. What § 3237 means, however, is that when a defendant does import a person *into* the United States, such as by driving that person from Mexico across the border to Las Vegas, he has committed a continuing offense for venue purposes. Were we to conclude that § 1324(a)(2) terminates as soon as the border is reached and the statutory elements are

satisfied, we would sap this part of § 3237 of all meaning. Venue would always lie only in the district which the alien first entered the country. There would be *no* offenses involving the importation of a person into the United States that were continuing for venue purposes, contrary to what § 3237 clearly contemplates. Such a construction of § 1324(a)(2) would run contrary to Congress' intent as expressed in § 3237.

**[5]** Third, our conclusion that an offense under § 1324(a)(2) does not end simply because all the statutory elements are satisfied is consistent with the ordinary meaning of the phrase "brings to." *See United States v. Cabaccang*, 332 F.3d 622, 626 (9th Cir. 2003) (en banc) ("When Congress has not provided special definitions, we must construe words in a statute 'according to their ordinary, contemporary, common meaning[s].' " (quoting *United States v. Hackett*, 311 F.3d 989, 992 (9th Cir. 2002)) (alteration in original)). The common understanding of the phrase "brings to," such as to "bring to" a particular large place, is to bring to some location *within* that large place and not simply to its outer boundary. An alien who is brought to the United States is usually brought by the transporter to a particular place in the country where he is dropped off, not just to the border. A construction of the statute in which the offense terminates as soon as the alien reaches the border conflicts with our common sense understanding of the language the statute employs.

**[6]** Fourth, our determination that the "brings to" offense is a continuing one is most consistent with the way we view the physical acts that commonly constitute the offense conduct in § 1324(a)(2) cases. If the crime ended as soon as an alien was brought "to" the United States, a transporter who drove an alien from Tijuana, Mexico, to a safe house one mile north of the border, for example, could be punished for two separate crimes: bringing the aliens "to" the United States and "transporting" them for another mile within the country. It makes more sense to think of this short, uninterrupted drive as con-

stituting a single "brings to" offense, a conception that is made possible by a construction of the statute that treats the offense as continuing.[10]

[7] Of course, our conclusion that the "brings to" offense continues past the point of entry is not the end of our inquiry, for "even continuing offenses are completed at some point." *United States v. Hernandez*, 189 F.3d 785, 791 (9th Cir. 1999). Our critical task is to determine when that point occurs for violations of § 1324(a)(2). We emphasize that the fact that § 1324(a)(2) is a continuing offense for venue purposes under 18 U.S.C. § 3237 in no way compels us to reach the conclusion the government suggests — that the "brings to" offense continues until the aliens reach their ultimate destination. If the venue statute contained language about ultimate destinations, we would confront a different question, but that is quite obviously not the case. The fact that a crime is continuing for venue purposes says nothing about *when* that crime terminates. It means merely that venue lies in any district touched by the crime before the crime is completed. *See Hernandez*, 189 F.3d at 791; *United States v. Barnard*, 490 F.2d 907, 910 (9th Cir. 1973). For example, a transporter who drives a group of illegal immigrants across the border at California or Arizona and drops them off in Las Vegas may, under the venue statute, be prosecuted in any one of two or more districts. Thus, § 3237 tells us that the crime is a continuing one and may provide the government with the opportunity to prosecute in more than one venue, but it sheds no light on whether the "brings to" offense terminates when the alien is dropped off initially at the location at which the initial transporter's conduct ends or whether it continues thereafter while other individuals commit acts of internal transportation that are covered by a different statutory provision.

---

[10]Our construction of § 1324(a)(2) is also consistent with what we have previously stated about the "transports within" offense. In *United States v. Covarrubias*, we held that "[t]he federal crime of transporting illegal immigrants [is] a continuing offense; it [remains] in progress as long as the defendants [are] transporting" the aliens. 179 F.3d at 1225.

**[8]** As stated previously, we hold that a "brings to" offense under § 1324(a)(2) terminates when the initial transporter drops the aliens off at a location in the United States: that may occur in the first district the transporter enters or it may not occur until after the transporter has driven through several districts. In so interpreting the statute, we have adopted a view of § 1324 that is most consistent with its text, structure, history, and purpose, and with the continuing offense venue provision. *See Kokoszka v. Belford*, 417 U.S. 642, 650 (1974) ("When 'interpreting a statute, the court will not look merely to a particular clause in which general words may be used, but will take in connection with it the whole statute . . . and the objects and policy of the law, as indicated by its various provisions, and give to it such a construction as will carry into execution the will of the Legislature . . . .' " (quoting *Brown v. Duchesne*, 60 U.S. (19 How.) 183, 194 (1857))).

**[9]** In construing the "brings to" offense, we observe initially that "[t]he language of the statute itself indicates that Congress intended it to apply to extraterritorial conduct." *Villanueva*, 408 F.3d at 198. That is, the "brings to" language of § 1324(a)(2) clearly connotes the act of bringing the alien "from outside" the country. The "transports within" offense of § 1324(a)(1)(A)(ii), by contrast, does not by its text implicate extraterritorial behavior. Indeed, the language of the latter provision limits the offense to acts "within the United States." On a plain reading of the statutory language, then, a person who moves aliens from one location in the United States to another has not brought those aliens "to" the United States, has not acted extraterritorially, and has not committed a "brings to" offense. He has acted entirely on domestic soil and has committed only a "transports within" offense. An interpretation of § 1324(a)(2) as persisting beyond the point at which the extraterritorial transporter terminates his conduct and drops the aliens off at some location in the United States would thus undermine the extraterritorial foundation of the crime as well as the distinction Congress established between bringing an alien "to" the United States and transporting one

already inside the country. *See* WILLIAM N. ESKRIDGE, JR. & PHILIP P. FRICKEY, LEGISLATION: STATUTES AND THE CREATION OF PUBLIC POLICY 646 (1988) ("[P]rovisions must be interpreted so as not to derogate from the force of other provisions and features of the whole statute.").

Even more persuasive to us, as we have already noted, § 1324 creates four separate offenses, including the "brings to" offense at issue here as well as the "transports within" offense of § 1324(a)(1)(A)(ii). Among its other attributes, our reading of § 1324 best harmonizes the various separate but often interrelated parts of the statute. In our prior decisions, we have found it useful to reason from statutory structure in determining the existence and contours of continuing offenses. The defendant in *United States v. Vowiell*, 869 F.2d 1264 (9th Cir. 1989), was charged with, *inter alia*, assisting an escape from federal custody, in violation of 18 U.S.C. § 752 (1988), and harboring an escapee, in violation of 18 U.S.C. § 1072 (1988). We held that the assisting offense continues through any immediate active pursuit, but no further. *See Vowiell*, 869 F.2d at 1268-69. In deciding when the assisting crime terminates, we wrote that "[a]n interpretation that assisting an escape under § 752(a) included harboring or concealing an escapee would be inconsistent with the clear statutory distinction" between the two provisions. *Id.* at 1268. We rejected the government's argument that *United States v. Bailey*, 444 U.S. 394 (1980), in which the Supreme Court held that escape itself continues as long as the escapee remains at large, required that assisting an escape also be deemed to so continue. *See Vowiell*, 869 F.2d at 1268-69. "Assisting escapees after the escape is complete constitutes a separate crime — harboring or concealing escapees," we wrote. *Id.* at 1269. We further explained:

> This separation reflects the different dangers which the two crimes pose . . . . In contrast, no *separate* crime exists for not turning one's self in after escaping. As the Supreme Court pointed out in *Bailey*, an

> escapee can be held liable for not returning to custody, but that conduct is included within the crime of *escape*. Not turning one's self in involves essentially the same danger as escaping — that someone who is supposed to be in legal custody will not fulfill the purpose of that custody.

*Id.* (citation omitted). Following the reasoning of *Vowiell*, we held in *United States v. Gray*, 876 F.2d 1411 (9th Cir. 1989), that failure to appear, in violation of 18 U.S.C. § 3146 (1988), *is* a continuing offense: because "no separate crime exists for failure to return for sentencing after having initially failed to appear for sentencing," and because "[t]he two actions pose the same danger to society and the legal system," we concluded that "[b]oth are part and parcel of one continuing offense." 876 F.2d at 1419.

**[10]** In this case, as in *Vowiell*, an interpretation that "brings to" under § 1324(a)(2) includes "transports within" — which, under the government's "immediate destination" theory, it often would — "would be inconsistent with the clear statutory distinction" between the two crimes, and even with the statutory distinction with the two other offenses covered by § 1324. Transporting an undocumented alien solely within the United States "constitutes a separate crime" from bringing one "to" the United States. Congress' distinction between those two offenses and the punishments that attach to each "reflects the different dangers which the two crimes pose." Unlike in *Gray*, a separate crime *does* exist in this case for the *wholly* domestic conduct of transporting an alien from one place in the United States to another — in other words, Congress has decided that such conduct is not "part and parcel" of the "brings to" offense. As in *Vowiell*, then, the "brings to" offense does not continue beyond the point at which the "transports [wholly] within" offense begins.[11]

---

[11]Similarly, adopting the government's construction would erode the distinction between the "brings to" and harboring offenses. *See* § 1324(a)(1)(A)(iii). Harboring or concealing during the period between the external and internal transportation would constitute aiding and abetting the extra-territorial "brings to" offense.

A rule that hinges the termination point of the "brings to" offense on the end of the initial transporter's conduct, as does ours, rather than on the aliens' ultimately reaching their final destination, as would the government's, more accurately reflects the history and purposes of the various statutory provisions that make up § 1324. In *United States v. Sanchez-Vargas*, 878 F.2d 1163 (9th Cir. 1989), we traced the evolution of § 1324 and its predecessor statutes. Prior to 1917, we explained, federal law criminalized only the bringing in or landing of undocumented aliens into the United States. *Id.* at 1168. That year, Congress addressed an apparent gap in immigration law by extending immigration enforcement efforts inland through proscribing the harboring and concealing of undocumented aliens. *Id.* Then, in 1952, Congress further broadened the coverage of its earlier legislation by creating the additional offenses of transporting aliens within the United States and inducing or encouraging the entry of aliens into the United States. *Id.* at 1169. Congressional debate suggests that the 1952 amendments were directed "at curbing the widespread practice of transporting illegal immigrants, already in the United States, to jobs and locations away from the border where immigration enforcement resources may have been more scarce." *Id.* We described the general evolution of the statute as "broadening the scope of proscribed conduct," rather than multiplying the charges or penalties. *Id.* Indeed, we concluded that Congress' purpose in adding the internal transport offense to the other enumerated smuggling offenses in § 1324(a)(1) was "to ensure that a 'new group of wrongdoers' — persons transporting aliens within the United States — would not escape punishment simply because they had not also brought those aliens into the United States." *Id.* at 1170. Congress' intent was, thus, not to extend the reach of the "brings to" provision or to multiply the charges for which an initial transporter might be eligible.

One lesson of the history we discussed in *Sanchez-Vargas* is that "wrongdoers" who transport aliens *within* the United States were not subject to punishment historically under the

"brings to" provision of § 1324. The purpose of the "brings to" provision was instead to criminalize the conduct of those who acted extraterritorially to move aliens from a foreign country to the United States. Indeed, the fact that wrongdoers who acted wholly domestically escaped punishment under the 1917 statute was, as we explained, the motivating force behind the enactment of the "transports within" provision in 1952. The construction of § 1324 most consistent with the statute's history and structure, therefore, is one that recognizes that the different provisions of § 1324 cover different groups of wrongdoers. By designating the termination point of the "brings to" offense as the end of the initial wrongdoer's physical involvement, and by permitting prosecution of the secondary wrongdoers — those who act entirely within the United States — only under the "transports within" provision, our construction accomplishes precisely what Congress intended. Under the government's proposed construction, by contrast, a "brings to" offense does not terminate until the alien reaches his ultimate destination, regardless of how many "wrongdoers" (or groups of "wrongdoers") transport or assist him during his journey. Such a rule would disregard Congress' intention to provide for the prosecution of different groups of wrongdoers under different provisions of the statute.

This is not, moreover, the only problem with the government's "immediate destination" test. Another concern is that, at bottom, the test has little basis in the law. The "immediate destination" language appears nowhere in § 1324 or the venue statute, and there is no reason for us to graft it onto § 1324 here. Indeed, the government's varying descriptions of its proposed rule — "immediate destination," "final destination," "ultimate destination," "intended destination" — highlight the sheer arbitrariness of adding to the statute language that has no basis in statutory text.[12]

---

[12]The "immediate destination" test is also difficult to administer because it invites debate over whether a particular stop along an alien's

The dissent's analogy between alien smuggling and drug smuggling, *see* dis. op. at 5019, is inapt. The statutory schemes that regulate the two types of importation are structured in entirely different ways. As we have explained at length, in enacting the current version of § 1324, Congress decided to punish under separate provisions the wrongdoers who bring illegal aliens across the border and those who transport them wholly within the United States. Both the offenses and the sentences are different. Congress employed a completely opposite and unitary approach to the transportation of drugs. There is no counterpart in the drug statutes to the "transports within" provision of § 1324(a)(1)(A)(ii). Unlike in the case of alien importation, the "importation" offense in the drug context covers both the extraterritorial transportation and the ensuing internal transportation. In the case of drugs, the government must prosecute all persons involved in their transportation under 21 U.S.C. § 952, the provision that forbids the "importation of controlled substances." Thus, the unitary statutory structure compels a broader reading of the transportation element of the importation of drugs statute than is permissible with respect to the "brings to" provision of the alien smuggling law, in which separate provisions exist to cover the different transportation stages of the criminal venture.[13]

---

path into the United States constitutes that alien's "immediate destination" or was instead merely a resting place or meeting point. In this case, for example, Lopez argues that the aliens had reached their immediate destination when they were dropped off at the prearranged point in the United States, while the government argues that their immediate destination was their final destination, Los Angeles.

[13]The dissent notes that 21 U.S.C. § 841(a)(1) prohibits "manufacturing, distributing, dispensing, or possessing with intent to manufacture, distribute, or dispense, a controlled substance." Dis. op. at 5026. The point, however, is that the drug statutes do *not* separately prohibit transporting a controlled substance "within" the United States, *see Cabaccang*, 332 F.3d at 623, whereas the alien smuggling statute does. As explained in the text, it is this distinction that compels a broader reading of the transportation element of the "importation" offense in the drug context than is appropriate in the case of the more specific and limited "brings to" provision of § 1324(a)(2).

The dissent also raises the specter of a circuit split by beginning with a string citation to out-of-circuit cases every one of which interprets the drug importation statute and none of which even mentions § 1324 or alien smuggling. *See* dis. op. at 5019. Because of the crucial differences between the two statutes, any "circuit split" created by these cases is completely illusory. The lone decision adopting the dissent's construction of § 1324, *United States v. Aslam*, 936 F.2d 751 (2d Cir. 1991), failed to consider the structural and historical arguments on which our opinion is based. *See id.* at 755. Significantly, the court in *Aslam* was considering a misdemeanor rather than a felony conviction. We are not inclined by virtue of this single decision to set aside our own careful analysis and adopt a ruling that would conflict with both the language of § 1324 and the patent congressional purpose of creating two separate felony alien trafficking offenses.[14]

---

[14]The dissent is of course correct that both alien smuggling and drug smuggling constitute continuing offenses under the federal venue statute, 18 U.S.C. § 3237. This does not mean, as we have explained, that the two "importation" offenses terminate at the same point. That is determined by the substantive statutes. The dissent relies upon a Senate report stating that the 1984 amendment to the venue statute, which first gave "importation" offenses their status as continuing crimes, was designed to overcome a district court decision "which limited venue in importation cases to the district of entry rather than of final destination." *See, e.g.*, dis. op. at 5025 (quoting S. REP. NO. 98-225, at 400 (1984), *as reprinted in* 1984 U.S.C.C.A.N. 3182, 3538) (internal quotation marks omitted). According to the dissent, this snippet of legislative history compels us to construe the extraterritorial "brings to" offense as continuing until the alien reaches his ultimate destination, no matter how many different persons transport the alien within the United States and no matter how many brief or extended layovers the alien may make in the interim. Such a brief quotation from the legislative history of a venue statute, however, would scarcely cause us to jettison our entire analysis of the text, structure, history, and purpose of the substantive statute we are actually construing. In any event, as the snippet states, the primary purpose of the 1984 amendment was to supersede a decision limiting venue to the district of entry. This is what labeling "importation" offenses as "continuing" accomplishes. Our construction effectuates that primary purpose by permitting prosecution of the initial transporter in any district through which he passes before the offense terminates.

**[11]** Turning to the facts of this case, it is undisputed that Lopez encountered the aliens and provided them with transportation only after they had been dropped off in the United States by the initial transporter who brought them across the border from Mexico. Thus, her act of transporting the aliens occurred only after the "brings to" offense had terminated and cannot, standing alone, serve as a basis for sustaining her conviction for aiding and abetting that offense. Lopez's "brings to" convictions must therefore be reversed unless the government can prevail on its second theory, that Lopez acted before the drop-off to aid and abet the extraterritorial offense.[15]

## C.

**[12]** The government's second theory of aiding and abetting liability, unlike its first, cannot be rejected as a matter of law. Under the aiding and abetting statute, 18 U.S.C. § 2, a person who "aids, abets, counsels, commands, induces or procures" the commission of an offense against the United States is "punishable as a principal." We have interpreted this statute on a number of occasions. In *United States v. Zemek*, 634 F.2d 1159 (9th Cir. 1980), we wrote that "[c]onviction as an aider and abettor requires proof the defendant willingly associated himself with the venture and participated therein as something he wished to bring about." *Id.* at 1174. Elsewhere, we have stated that "[a]n abettor is one 'who, with *mens rea* . . . commands, counsels or otherwise encourages the perpetrator to commit the crime.' " *United States v. Barnett*, 667 F.2d 835, 841 (9th Cir. 1982) (quoting ROLLIN M. PERKINS, CRIMINAL LAW 645 (2d ed. 1969)); *see also* NINTH CIRCUIT MODEL CRIMINAL JURY INSTRUCTIONS § 5.1 (2005) (instructing

---

[15]As a point of clarification, our holding today does not require us to overrule *United States v. Gonzales-Torres*. Under *Gonzalez-Torres*, the elements of the "brings to" offense may be satisfied as soon as the aliens are brought to the United States, regardless of formal entry; under today's decision, the offense continues until the initial transporter who brings the aliens drops them off at a location in the United States.

that, to obtain a conviction for aiding and abetting, the government must prove beyond a reasonable doubt that, *inter alia*, the defendant "knowingly and intentionally aided, counseled, commanded, induced or procured [the principal] to commit each element" of the crime charged). We have held that aiding and abetting has four elements including, as most relevant here, "that the accused had the specific intent to facilitate the commission of a crime by another" and "that the accused assisted or participated in the commission of the underlying substantive offense." *United States v. Gaskins*, 849 F.2d 454, 459 (9th Cir. 1988).

It is clear that under certain circumstances a defendant who does not physically transport aliens across the border may be held criminally liable for aiding and abetting a "brings to" offense. A financier who organizes and funds a smuggling operation, for example, whether located in or outside of the United States, may be said to have "associate[d] himself with the venture, . . . participate[d] in it as in something he wishe[d] to bring about, [and sought] by his action to make it succeed." *Nye & Nissen v. United States*, 336 U.S. 613, 619 (1949) (quoting *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir. 1938)); *cf. Barnes v. United States*, 215 F.2d 91, 91 (9th Cir. 1954) (upholding "brings into" conviction of a defendant who "negotiated and planned entry for . . . aliens," drove the aliens to a Mexican city near the border, and met up with them again on the United States side). We need not determine today, however, precisely what actions may and may not render a defendant guilty of aiding and abetting.[16] Lopez's actions do not qualify under any definition.

---

[16] Any complete specification of the category of aiders and abettors would have to take into account, and attempt to avoid redundancy with, the separate offense Congress created for one who "encourages or induces an alien to come to, enter, or reside in the United States, knowing or in reckless disregard of the fact that such coming to, entry, or residence is or will be in violation of law." § 1324(a)(1)(A)(iv).

**[13]** The mere act of picking up aliens at a location near the border and transporting them within the United States is not sufficient to support a conviction for aiding and abetting a "brings to" offense.[17] Nor does the fact that following completion of the "brings to" offense Lopez twice spoke to a person who may have been the transporter add anything to the equation. Such evidence cannot, without more, establish the intent necessary to prove aiding and abetting — it cannot show that the defendant knowingly and intentionally commanded, counseled, or encouraged the initial transporter to commit the "brings to" offense. Moreover, a "brings to" conviction would be particularly inappropriate in this case, in which, as the district court found, the defendant "wasn't obviously the first choice" — "someone else was supposed to pick [the aliens] up," and Lopez was contacted on the day she transported them only after the aliens were already in the country and the plan for the first person to pick them up had been frustrated by his arrest when he appeared at the designated location.

The government attempts to squeeze from the record additional evidence to show that Lopez aided and abetted the smuggling scheme before the aliens were brought to the United States. The government points to two pieces of evidence in the record. First, the government notes that Lopez made "arrangements to put the vehicle in her name on May 28, 2004 and to travel near the border to pick up the vehicle." Second, the government points out that "Lopez stated that she was contacted by 'Jose' twice on the day of the offense regarding the transportation arrangements. At no point," the government observes, "did Agent Huber say, nor did the Government argue, that Lopez's discussions with Jose on June 1, 2004, were her first contact with him." The government then notes, "the fact that Lopez was able to provide Agent Huber

---

[17]Two of our prior decisions, *Ramirez-Martinez* and *Angwin*, may be read to suggest that such evidence is sufficient. *See* 273 F.3d at 912-13; 271 F.3d at 804-05. To the extent that these decisions stand for that proposition, we overrule them today.

with a physical description of Jose implies contact with him that predated the telephone conversations she had with him that day."[18] The district court found this evidence sufficient to prove beyond a reasonable doubt that Lopez was involved in transporting the aliens to the United States before the aliens entered the country, although it agreed with the defense that "it's somewhat questionable, because [Lopez] wasn't obviously the first choice. Because someone else was supposed to pick them up."

We hold that, viewing the evidence in the light most favorable to the government, any rational juror would have had at the least a reasonable doubt as to whether Lopez "knowingly and intentionally aided, counseled, commanded, induced or procured [the principal] to commit each element" of the "brings to" offense. The government merely speculated that the timing of Lopez's vehicle purchase seemed suspicious. As the district court found, however, even after the date on which she acquired the car, Lopez was not the person Jose made arrangements with to drive the illegal aliens to Los Angeles upon their arrival in the United States — she was instead only a substitute who was called after they were already here. Thus, the government's arguments about the inferences a rational juror might draw from the timing of the purchase are wholly unpersuasive. As we have previously held, "mere suspicion or speculation does not rise to the level of sufficient

---

[18]The record contains no further information as to who Jose is or what role he played. There is no testimony as to whether he was located in Mexico or the United States, whether he physically brought the illegal aliens to the United States himself or simply made the arrangements for their transportation, whether the transportation of the group of aliens in this case was an isolated episode or, as seems more likely, whether Jose was regularly engaged in the alien smuggling business. Given the minimal evidence in the record as to Jose's identity and role as well as to Lopez's connection with Jose, it is difficult to understand what inferences the government believes that the jury could have drawn that would support a verdict that Lopez was guilty beyond a reasonable doubt of aiding and abetting the extraterritorial act.

evidence." *United States v. Stauffer*, 922 F.2d 508, 514 (9th Cir. 1990). The government's other argument regarding Jose fares no better. Whatever the relevance may be of communications prior to the time aliens are brought from outside the country to the United States, any communication Lopez had with Jose on June 1 is clearly irrelevant because it occurred after the "brings to" offense had been completed. Even if, as the government suggests, Lopez's ability to give a physical description of Jose tends to show that she had met Jose prior to June 1, that is all it shows. The inferential leap required to conclude that Lopez and Jose's prior communications involved efforts on the part of Lopez to induce or encourage Jose to smuggle aliens on June 1 is completely without foundation, and no rational juror could draw such an inference or conclude that the fact of a prior acquaintanceship constitutes proof beyond a reasonable doubt of any such effort on Lopez's part.

[14] Nor is all of the government's evidence taken together sufficient to allow a rational factfinder to find Lopez guilty. To prove aiding and abetting, the government cannot show merely that Lopez was associated with Jose or with the transportation of the aliens within the United States — it must show more. *See* NINTH CIRCUIT MODEL CRIMINAL JURY INSTRUCTIONS § 5.1 (2005); *United States v. Burgess*, 791 F.2d 676, 679-80 (9th Cir. 1986). Specifically, it must show that the "brings to" offense was something that Lopez had the specific intent to bring about, *Gaskins*, 849 F.2d at 459; *Zemek*, 634 F.2d at 1174, and that she knowingly and intentionally commanded, counseled, or encouraged the initial transporter to commit the "brings to" offense, *Barnett*, 667 F.2d at 841.[19]

---

[19]Contrary to the dissent's oblique suggestion, *see* dis. op. at 5031, we do not decide that if a smuggling operation "relies on" a secondary, stateside transporter — in the sense that the secondary transporter's agreement to participate induces or encourages the commission of the initial, extraterritorial "brings to" offense and the secondary transporter intended to so induce or encourage the commission of the crime — aiding and abetting liability will never lie. Those are not the facts of this case and we do not consider that question here.

There is no evidence whatsoever to this effect in the record. We therefore reverse Lopez's "brings to" convictions.

## IV

We hold that the offense of bringing an alien to the United States in violation of 8 U.S.C. § 1324(a)(2) is a continuing offense that terminates when the initial transporter who brings the alien to the United States drops off the alien at a location in this country. Viewing the statute in that light, we reverse Lopez's convictions for violations of § 1324(a)(2). Lopez transported the aliens only within this country and only after they had been dropped off here and the "brings to" offense had terminated. The evidence of her involvement prior to the termination of the "brings to" offense, to the extent that any exists in the record, is wholly insufficient to establish aiding and abetting liability on her part. We express no opinion on Lopez's *Miranda* and Confrontation Clause claims with respect to the "transports within" counts and refer those counts to the original three-judge panel for resolution of those and any other issues.

**REVERSED IN PART AND REFERRED IN PART TO THE THREE-JUDGE PANEL.**

BEA, Circuit Judge, specially concurring:

I agree with the majority that Lopez transported illegal aliens only within the United States and that there is insufficient evidence that Lopez otherwise aided and abetted the "brings to" offense. I do not agree that the "brings to" offense continues until the initial transporter drops off the aliens. By the plain text of the statute, the offense is completed at the border. Any further transportation may constitute transporting an illegal alien within the United States under 8 U.S.C.

§ 1324(a)(1)(A)(ii), but does not constitute "bringing to" the United States such alien.

The majority opinion is an extended exercise in statutory interpretation, on grounds and using methods which I do not endorse. But there is no point in commenting further because it is also an exercise unnecessary to decision. 8 U.S.C. § 1324(a)(2)(B)(ii) makes it illegal to "bring[ ] to . . . the United States" an illegal alien. A person "brings to" the United States an illegal alien when he transports the alien across any border. That is the plain meaning of the statute, and I can see no reason to depart from it.

---

TALLMAN, Circuit Judge, with whom Circuit Judges RAWLINSON, CLIFTON and CALLAHAN join, dissenting:

The law should be the same whether smuggling aliens, drugs, or contraband goods. Today, the majority creates a circuit split by announcing a rule that contravenes established precedent and undermines congressional intent. Congress and every other circuit court to address the issue have all concluded that importation offenses continue until the imported objects or persons reach their final destination within the United States. *See United States v. Haire*, 371 F.3d 833, 838 (D.C. Cir. 2004), *vacated on other grounds*, 543 U.S. 1109 (2005); *United States v. Turner*, 936 F.2d 221, 226 (6th Cir. 1991); *United States v. Leal*, 831 F.2d 7, 9-10 (1st Cir. 1987) (per curiam); *United States v. Sandini*, 803 F.2d 123, 128 (3d Cir. 1986); *United States v. MacDougall*, 790 F.2d 1135, 1150-51 (4th Cir. 1986); *United States v. Netz*, 758 F.2d 1308, 1312 (8th Cir. 1985) (per curiam); *United States v. Corbin*, 734 F.2d 643, 652 (11th Cir. 1984); *United States v. Godwin*, 546 F.2d 145, 146-48 (5th Cir. 1977); *United States v. Jackson*, 482 F.2d 1167, 1178-79 (10th Cir. 1973); S. REP. No. 98-225, at 400 (1983), *as reprinted in* 1984 U.S.C.C.A.N. 3182, 3538.

Rather than following this long line of authority, our court unnecessarily injects inconsistency into the law by concluding that alien importation ends once the "initial transporter who brings the aliens to the United States ceases to transport [the aliens]." Maj. op. 4994. In doing so, the majority fails to give sufficient credence to the long recognized doctrine of aider and abetter liability, which punishes the convicted defendant as a principal. *See* 18 U.S.C. § 2. I respectfully dissent.

I

Even under the majority's interpretation of the scope of the "brings to" offense, the convictions should be affirmed. There was sufficient evidence for the jury to find that Lopez agreed to participate in the alien smuggling venture prior to when the initial transporter ceased transporting the aliens. We review de novo a district court's denial of a motion for judgment of acquittal under Federal Rule of Criminal Procedure 29. *United States v. Bahena-Cardenas*, 70 F.3d 1071, 1072 (9th Cir. 1995). "In assessing the sufficiency of the evidence, 'we are required to view the evidence in the light most favorable to the government and determine whether there was sufficient evidence from which a jury could rationally conclude beyond a reasonable doubt that [the defendant] was guilty of each count charged.' " *United States. v. Barajas-Montiel*, 185 F.3d 947, 954 (9th Cir. 1999) (quoting *United States v. Esparza*, 876 F.2d 1390, 1391 (9th Cir. 1989)). "[C]ircumstantial evidence can be used to prove any fact, including facts from which another fact is to be inferred, and is not to be distinguished from testimonial evidence insofar as the jury's fact-finding function is concerned." *United States v. Stauffer*, 922 F.2d 508, 514 (9th Cir. 1990) (internal quotation marks omitted; alteration in original).

Border Patrol Agents apprehended Angelica Lopez ("Lopez") on June 1, 2004, using a large white Ford Expedition to transport twelve illegal aliens east on Interstate 8. Agent Huber testified that Lopez admitted to making arrange-

ments with a person named Jose earlier that day to transport the aliens to El Centro, California. Jose instructed her to drive to a location near where the agents apprehended her and advised her that there would be a sweater lying in the road to indicate where she could find the aliens. Initially, Jose promised to pay Lopez $100 for each individual she transported; however, he called her sometime later to change the arrangements to a flat fee of $500 for the entire group. Lopez gave a vague physical description of Jose, describing him as a bald, short, heavyset man.

Lopez also testified that she had purchased her Ford Expedition a few days earlier on May 28, 2004. She had noticed the vehicle outside an Applebee's restaurant in Montclaire, California. However, when she made arrangements to actually purchase the car, the owner had it in a tow yard located some two and a half hours from where she lived, near where the aliens where to be picked up. The vehicle was registered in Lopez's name on May 28, 2004, but Lopez did not go to pick it up until June 1, 2004, the day Jose contacted her about transporting the aliens to El Centro.

Viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could reasonably conclude that Lopez made arrangements with Jose prior to June 1, 2004, to aid in the completion of this smuggling venture. The jury could also reasonably infer that her decision to purchase this used Ford Expedition—which happened to be located near where the aliens were hiding—and to pick up the vehicle on the day Jose asked her to transport the aliens was more than a mere coincidence. It is not unheard of in our experience for smugglers to employ used or rented vehicles in aid of their schemes in case of interdiction, seizure, and subsequent forfeiture of the instrumentality of the crime. As the district court concluded:

> [I]f you combine [Lopez's] testimony as to when she was getting the car, that would be some evidence as

to the fact that she was involved in this before the aliens crossed; or about the time. Because when she registered it to her, registered the vehicle to her, she indicated it was before the day she went down there.

And so, although Jose calls her, according to her statement, that day, that doesn't mean that she had an agreement with Jose before, that she was going to do it; just Jose was going to call her and tell her when, get the car registered. I'll let you know when to do it. I think that's a reasonable inference that can be drawn.

Because there is sufficient evidence to conclude that Lopez aided and abetted the venture prior to when the initial transporter ceased transporting the aliens, the convictions should be affirmed even under the majority's novel interpretation.

## II

Our court glosses over Congress's expressed purpose to treat importation schemes as continuing offenses in enacting the companion federal venue statute, 18 U.S.C. § 3237,[1] when it holds that the "brings to" offense under 8 U.S.C. § 1324(a)(2)[2] terminates once the initial transporter ceases transporting the alien. In light of § 3237's plain language, the court acknowledges that importation crimes are continuing offenses for

---

[1]In pertinent part, § 3237(a) provides:

> Any offense involving the use of the mails, transportation in interstate or foreign commerce, or the importation of an object or person into the United States is a continuing offense and, except as otherwise expressly provided by enactment of Congress, may be inquired of and prosecuted in any district from, through, or into which such commerce, mail matter, or imported object or person moves.

[2]As does the majority, I will cite to the 2000 edition of the United States Code. *See* Maj. Op. 4994 n.1.

venue purposes. Maj. op. 5000-04. However, it surmises that this "in no way compels" a conclusion that the "brings to" offense continues until the alien reaches his or her final destination in the United States because the words "ultimate destination" do not appear anywhere in the federal venue statute. Maj. op. 5004-05.[3] After scouring the text of the federal venue statute, its legislative history, and § 1324, one searches in vain to find the words "initial transporter," a phrase our court now employs to define the scope of the "brings to" offense.

When a statute is ambiguous "we [must] determine its scope with reference to its legislative history." *Coeur D'Alene Tribe of Idaho v. Hammond*, 384 F.3d 674, 692-93 (9th Cir. 2004) (citing *Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584, 587 (1977)). The legislative history of § 3237 is clear: importation offenses continue until the imported person or object reaches its *final* destination within the United States. *See* S. REP. NO. 98-225, at 400, *as reprinted in* 1984 U.S.C.C.A.N. at 3538.

In 1984 Congress amended the federal venue statute, *see* Pub. L. No. 98-473, § 1204, 98 Stat. 1837, 2152 (1984), to abrogate judicial opinions in which courts had held that importation offenses end once the person or object arrives at the district of entry. *See* S. REP. NO. 98-225, at 400, *as reprinted in* 1984 U.S.C.C.A.N. at 3538. The legislative history reflects that through this amendment Congress intended to "add offenses involving the importation of a person or an object into the United States and thereby to classify such offenses as continuing offenses for which venue is appropriate in any district in which the imported object or person moves." *Id.* In doing so, Congress sought to "overcome" restrictive

---

[3]The majority goes on to state that "the government's varying descriptions of its proposed rule—'immediate destination,' 'final destination,' 'ultimate destination,' 'intended destination'—highlight the sheer arbitrariness of adding to the statute language that has no basis in statutory text." Maj. op. 5010.

decisions such as *United States v. Lember*, 319 F. Supp. 249 (E.D. Va. 1970), in which the district court determined that the crime of smuggling terminates once the contraband arrived in the district of entry as opposed to the district of final destination. S. REP. NO. 98-225, at 400, *as reprinted in* 1984 U.S.C.C.A.N. at 3538.

Our court overlooks this integral piece of legislative history.[4] It makes no mention of the fact that even though the district court in *Lember* based its reasoning on many of the same arguments the majority now cites in support of its narrower interpretation, Congress nevertheless favored the broader interpretation—that importation offenses continue until the person or object reaches its final destination. In *Lember*, a package mailed from Vietnam was addressed to the defendant's wife in Virginia Beach, Virginia. 319 F. Supp. at 250. When the package arrived at the San Francisco International Airport, a United States customs agent opened the package during a routine check and found marijuana. *Id.* The agent resealed and delivered the package to the Virginia Beach address. *Id.* Eventually, the defendant was indicted and tried in the Eastern District of Virginia. *Id.* After the district court declared a mistrial, the defense filed a motion for judgment of acquittal, arguing that the prosecution could not proceed in Virginia, but rather that proper venue lay only in the Northern District of California. *Id.* The district court agreed. *Id.* at 251-52. Relying on an 1899 decision of the Supreme Court, *Keck v. United States*, 172 U.S. 434, it concluded that "the crime of smuggling was complete when the package arrived ashore and was opened at the San Francisco Airport." *Lember*, 319 F. Supp. at 251.

In *Keck*, the Supreme Court determined that the offense of

---

[4]Although the court concedes that "[i]f the venue statute contained language about ultimate destinations, we would confront a different question," maj. op. 5005, it dismisses such language as a mere "snippet" of legislative history, maj. op. at 5012 n.14.

smuggling or clandestinely introducing contraband into the United States was completed once the goods arrived at the port of entry. 172 U.S. at 454-55; *see also Lember*, 319 F. Supp. at 251 (discussing *Keck*). The Court reasoned that the statute

> was not intended to make smuggling embrace each or all of the acts theretofore prohibited which could precede or which might follow smuggling . . . [;] that is, the statute was intended not to merge into one and the same offense all the many acts which had been previously classified and punished by different penalties, but to legislate against the overt act of smuggling itself.

172 U.S. at 454-55. Therefore, in the Court's view, the smuggling statute "related not generally to acts which precede smuggling[ ] or which might follow it, but to the concrete offense of smuggling[ ] alone." *Id.* at 455. The majority reverts to the same rationale here by pointing to the different crimes of transporting, bringing to, and harboring or concealing.

In amending the statute, Congress rejected the rationale of *Lember*, and in turn, the rationale of *Keck*, at least to the extent *Keck* is read for the proposition that illegal importation ends at the port of entry. Therefore, although the majority correctly notes that § 1324 punishes four distinct acts related to smuggling, *see* maj. op. 5006-07, the legislative history indicates that Congress nevertheless intended to punish—under the "brings to" offense—any person who helped get the alien to his or her final destination within the United States. *See* S. REP. No. 98-225, at 400, *as reprinted in* 1984 U.S.C.C.A.N. at 3538 (stating that the amendment "[wa]s designed to overcome the decision in *United States v. Lember*, which limited venue in importation cases to the district of entry rather than of *final* destination" (footnote omitted; emphasis added)). Any other construction would be "unjustified" in that it "would

create difficulties since the witnesses are usually located in the place of destination" and "the district of destination rather than first entry normally has the greater interest in vindicating the offense." *Id.*

In disregarding legislative history our court also creates a circuit split, departing from how other circuits have defined the scope of importation offenses. In *Sandini*, the Third Circuit rejected the defendant's argument, which would have "reinstate[d] *Lember's* irrational port of entry rule" and held that under the "plain meaning of [§ 3237], venue [wa]s proper in the Western District of Pennsylvania because the 'imported object,' *i.e.*, the marijuana, 'move[d]' into the Western District of Pennsylvania." 803 F.2d at 128, 129 (final alteration in original); *see also id.* at 128 ("Although the Western District of Pennsylvania may not have been the final destination intended by the appellant, it was nevertheless the final destination of a considerable amount of the marijuana he conspired to import into this country."). Moreover, every circuit that has addressed the issue has concluded that importation offenses continue until the imported object reaches its final destination within the United States. *See supra*, at 5019.

The majority employs a spurious structural argument in an attempt to justify its inconsistent treatment of alien and drug smuggling. *See* Maj. op. 5011. In doing so, it ignores 21 U.S.C. § 841(a)(1), which punishes the related drug-trafficking offenses of manufacturing, distributing, dispensing, or possessing with intent to manufacture, distribute, or dispense, a controlled substance. Congress intended § 841(a)(1) to cover conduct intimately connected to the act of smuggling drugs, e.g., simultaneously punishing possession with intent to distribute, *see United States v. Dubrofsky*, 581 F.2d 208, 213 (9th Cir. 1978) ("Congress clearly viewed importation and possession with intent to distribute as separate evils that could be punished cumulatively."), whether the smuggler was interdicted inside or outside the territorial boundaries of the United States, *see United States v. Larsen*,

952 F.2d 1099, 1100-01 (9th Cir. 1991) (holding that § 841(a)(1) has extraterritorial application).

Persons involved in drug smuggling schemes, like those involved in alien smuggling schemes, can be prosecuted under a variety of statutory means, not just under the misnamed "unitary" crime of § 952 as the majority reasons. The venue statute, 18 U.S.C. § 3237, should be harmoniously read to reach all such means of violating either alien or drug smuggling statutes. That is why drug importation crimes can be freely prosecuted in any federal district impacted by the activities of the drug smuggling enterprise. Logic compels the conclusion that Congress expected no different result when prosecuting enterprises involving alien smuggling. The split created today by the majority's approach is real and substantial and cannot be dismissed in reliance on the narrow structural differentiation employed in our court's decision.

A conclusion that the "brings to" offense continues until the alien reaches his or her final destination would not seriously erode the distinction between the importation offense and the transportation offense. The act of bringing aliens to the United States encompasses activities that occur at the earliest manifestations of an alien smuggling venture. As the majority notes, "[b]ringing aliens to the United States requires transporting them over a period of time and distance[,] and thus does not occur at one particular moment or location." Maj. op. 5002-03. Large scale importation operations do not terminate once the "initial transporter" or "guide" ceases to transport the aliens. As is the case here, aliens often pay the smuggler to transport them to a particular place in the country, not a hillside just across the border. Recognizing that importation "is not a static or an instantaneous occurrence, geographically or temporally," maj. op. 5002, the crime punishing the importation of aliens should include the transportation of those aliens to their final destination.

In comparison, the transportation and harboring or concealing of illegal aliens covers the continued presence and operation of the alien smugglers within the United States.[5] Thus, separate crimes apply to later criminal conduct by those who knowingly transport, harbor, or conceal aliens even though they had nothing to do with smuggling them into the United States. Each case must turn on its own facts. But Congress was free to criminalize a broad range of activities, punishing those who assist others in flouting our immigration laws. Those who arrange, pay for, or otherwise aid or abet the smuggling venture are liable as principals under 18 U.S.C. § 2. *See United States v. Carranza*, 289 F.3d 634, 642 (9th Cir. 2002) (finding sufficient evidence to convict defendant of importing marijuana when he participated in a test run, riding as a passenger in the vehicle that brought drugs across the border); *United States v. Flickinger*, 573 F.2d 1349, 1359-60 (9th Cir. 1978) (convicting defendants of illegally importing marijuana into the United States because they aided or abetted the crime), *overruled on other grounds by United States v. McConney*, 728 F.2d 1195, 1204-05 (9th Cir. 1984) (en banc), *abrogated on other grounds as recognized in Estate of Merchant v. Comm'r*, 947 F.2d 1390 (9th Cir. 1991).

As we stated in *United States v. Sanchez-Vargas*, 878 F.2d 1163 (9th Cir. 1989), "congressional debate . . . suggests that the transport offense was directed, in large part, at curbing the

---

[5]The inquiry is heavily dependant on the facts of the particular case. Here, the evidence showed payment to smugglers to deliver the aliens to Los Angeles, where the aliens presumably intended to meet friends or family. On these facts, once they reached Los Angeles the "brings to" crime would have been completed. Thus, a family member who thereafter picked up an alien in Los Angeles and transported him or her to Portland, Oregon, could not be convicted of the "brings to" offense, but only the transportation offense, in the absence of any evidence linking the family member to the smugglers. Similarly, a family member who allowed an alien to stay at his or her home in Los Angeles, knowing the alien was here illegally, could be convicted of harboring or concealing an illegal alien. *See* 8 U.S.C. § 1324(a)(1)(A)(iii).

widespread practice of transporting illegal immigrants, already in the United States, to jobs and locations away from the border where immigration enforcement resources may have been more scarce." *Id.* at 1169. In other words, Congress intended to punish those who encouraged the continued presence of the illegal aliens by transporting them to other locations within the United States.[6]

The legislative history also cites with approval the Fifth Circuit's decision in *Godwin*, 546 F.2d 145, and the Tenth Circuit's decision in *Jackson*, 482 F.2d 1167. S. REP. NO. 98-225, at 400 n.945, *as reprinted in* 1984 U.S.C.C.A.N. at 3538. In *Jackson*, the defendant argued that the federal district court in Colorado was not the proper venue to try the case when the authorities first discovered the smuggling venture in California. 482 F.2d at 1178. The Tenth Circuit rejected that argument, reasoning:

> [Title 21 U.S.C. §] 952(a) prohibits importation of heroin into the United States from any place outside thereof. The statute does not necessarily pertain to any particular locality such as the place of entry, for it prohibits importation anywhere in the United States. Appellants charge, however, the offense was completed the moment the smuggling attempt was discovered in California and thus does not continue

---

[6]That Congress provided differing punishments for certain conduct reflects only a legislative judgment that specific behavior is more or less culpable and deserving of a harsher penalty. It has no bearing on the statutory interpretation question we here decide. Nevertheless, I note that a conviction under 8 U.S.C. § 1324(a)(2) for bringing illegal aliens to the United States for commercial advantage or private financial gain will result in a sentence of not less than 3 years and not more than 10 years for the first or second offense. *Id.* § 1324(a)(2)(B). For any such other violation, the district court shall impose a sentence of not less than 5 but not more than 15 years. *Id.* In comparison, a conviction under 8 U.S.C. § 1324(a)(1)(A)(ii) for transporting illegal aliens for commercial advantage or private financial gain will result in a sentence of not more than 10 years. *Id.* § 1324(a)(1)(B)(i).

> to the smuggling attempt's destination point in Colorado. Admittedly a crime was committed the moment the heroin package entered the United States, but discovery of the crime in California did not exhaust it. The illicit scheme originated in Thailand and from there it extended to Lowry Air Force Base, Colorado. During the illicit venture the heroin was discovered in California but certainly the crime was not completed there. It was a continuous crime which received no finality until the package arrived at Lowry Air Force Base.

*Id.* (citation omitted). In *Godwin*, the court expressly rejected the holding in *Lember* and adopted the reasoning of the Tenth Circuit in *Jackson*. 546 F.2d at 146-47.

The need for consistency in the interpretation of importation offenses—whether it involves the importation of illegal aliens or illegal contraband—did not go unnoticed by the Second Circuit. The "immediate destination" theory adopted by a three-judge panel of our court in *United States v. Ramirez-Martinez*, 273 F.3d 903, 912 (9th Cir. 2001), originated in *United States v. Aslam*, 936 F.2d 751, 755 (2d Cir. 1991). Aslam, a Pakistani citizen, met two illegal aliens just south of the Canadian border. *Id.* at 753. The evidence showed that a guide had driven the aliens to the Canadian side of the border, accompanied them across the border, and then walked back to the Canadian side. *Id.* Aslam waited for the aliens at a prearranged location south of the border to "complete their entry into the United States." *Id.* In concluding that Aslam's conduct violated the "bringing to" prong of the statute, the Second Circuit stated that

> section 1324(a)(2) punishes those who participate in the process of bringing illegal aliens into the United States, and . . . the offense does not end at the instant the alien sets foot across the border. The illegal importation of aliens, like the illegal importation of

drugs, *see United States v. Leal*, 831 F.2d 7, 9 (1st Cir. 1987), *United States v. MacDougall*, 790 F.2d 1135, 1150-51, 1153 (4th Cir. 1986), continues at least until the alien reaches his *immediate destination* in this country.

*Id.* at 755 (emphasis added).

The *Aslam* court compared illegal importation of aliens to the illegal importation of controlled substances. In doing so, it cited *Leal*, 831 F.2d 7, and *MacDougall*, 790 F.2d 1135, where the First Circuit and the Fourth Circuit stated, not that the illegal importation ended when the initial transporter ceases to transport the imported object or person, but rather when they reached their "final destination." *Leal*, 831 F.2d at 9 ("[I]mportation is a " 'continuous crime" that is not complete until the controlled substance reaches its final destination point.' " (quoting *Corbin*, 734 F.2d at 652)); *MacDougall*, 790 F.2d at 1151 (same); *see also Sandini*, 803 F.2d at 128 (stating that for purposes of establishing venue under 18 U.S.C. § 3237(a), "the proper venue for the prosecution was the final destination of the contraband rather than the port at which the narcotics entered the country").

No court has conclusively defined the temporal parameters of importation offenses. *See Leal*, 831 F.2d at 9 (stating that "[w]hile the precise temporal parameters of importation have not yet been addressed," it is clear that "importation is a continuous crime that is not complete until the controlled substance reaches its final destination point" (internal quotation marks omitted)). Nevertheless, as in other contexts, this is a matter that is best left for the jury to decide based on the facts presented in each case and the vagaries of smuggling schemes concocted by the criminal mind.[7]

---

[7]For instance, the majority cites *United States v. Vowiell*, 869 F.2d 1264 (9th Cir. 1989), in which we held that the crime of aiding an escape ends once the immediate active pursuit of the escapee ends. *Id.* at 1268-69.

Moreover, when Congress amended the alien smuggling statute in 1986, it did not seek to narrow its construction of general importation offenses. Instead, it sought to "expand the scope of activities proscribed" by "smuggling and related offenses." *See* H.R. REP. NO. 99-682(I), 65 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5649, 5669. "[It] believe[d] such modifications . . . essential in light of recent judicial opinions which ha[d] interpreted [then] existing law as not applying to certain activities that clearly [we]re prejudicial to the interests of the United States." *Id.* Today, rather than adhering to unambiguous congressional intent, our court unnecessarily restricts the scope of the "brings to" offense and creates inconsistency in the law by treating alien smuggling differently from drug smuggling.

## III

We should reaffirm our prior decisions in *United States v. Ramirez-Martinez*, 273 F.3d 903, and *United States v. Angwin*, 271 F.3d 786 (9th Cir. 2001). Pre-border involvement is not required for a "bringing to" conviction under 8 U.S.C. § 1324(a)(2). *Cf. Flickinger*, 573 F.2d at 1359-60 (affirming conviction because, although the defendants did not transport the marijuana across the border, they aided and abetted the importation venture). As the panel concluded in *Ramirez-Martinez*, if the defendant is involved in any "concerted action" to bring an illegal alien to the United States he is guilty of the "bringing to" crime. 273 F.3d at 912. This is consistent with notions of aider and abetter liability long recognized in federal criminal law. *See* 18 U.S.C. § 2; *see also Ramirez-Martinez*, 273 F.3d at 912 (citing *Pinkerton v.*

However, determining when the "immediate active pursuit" ends is no more difficult than ascertaining the aliens' "final destination." *See United States v. Smithers*, 27 F.3d 142, 145 (5th Cir. 1994) (noting that determining the end of an "immediate active pursuit" is obviously a fact-intensive inquiry).

*United States*, 328 U.S. 640, 646 (1946) ("[S]o long as the partnership in crime continues, the partners act for each other in carrying it forward."); *Smith v. United States*, 24 F.2d 907, 907 (5th Cir. 1928) (finding aider and abetter liability when defendant waited in the woods with an automobile for illegal aliens arriving from Cuba and then transported them to Tampa, Florida)).

In *Ramirez-Martinez*, we upheld a conviction for bringing an illegal alien to the United States when the evidence supporting Ramirez-Martinez's conviction was that he knew an unidentified individual who took him to a prearranged location to meet the illegal aliens, after which Ramirez-Martinez planned to drive the aliens to Los Angeles for money. 273 F.3d at 907, 912-13. In support of our holding we said:

> When a defendant does not physically accompany the undocumented alien across the United States border, for example, the government can still prove that the defendant acted before the offense was completed by showing, for instance, that the defendant was part of some "concerted action" to bring the aliens to the United States. As the Fifth Circuit put the matter: "If what the evidence showed [the defendant] did in concert with other accused encouraged the latter unlawfully to bring the aliens into and land them in the United States, he aided and abetted them in so doing." *Smith v. United States*, 24 F.2d 907, 907 (5th Cir. 1928).

*Id.* at 912 (alteration in original). Because there was a "concerted effort to bring the undocumented aliens" to the United States, and because Ramirez-Martinez was a part of that effort, there was sufficient evidence to convict him of the "bringing to" crime. *Id.*

We also upheld a similar conviction in *Angwin*, 271 F.3d 786, emphasizing Angwin's role in the overall operation as

opposed to his connection to the "initial transporter." *See id.* at 805. Rejecting Angwin's argument of insufficient evidence, we said:

> The aliens Angwin transported were traveling to Los Angeles, Angwin met them at a prearranged location shortly after some of them arrived at the United States, and he immediately helped transport them north. Under those circumstances a rational jury could easily conclude beyond a reasonable doubt that Angwin aided and abetted a smuggling operation to bring aliens to the United States. His role in meeting the aliens at a prearranged location just north of the border within minutes of their arrival [in] the United States was essential to the success of the entire operation. While there may be some circumstances where a defendant's prearranged transportation of aliens is so remote in time and/or geography from the aliens' entry into the United States that no rational jury could conclude that the defendant aided and abetted the bringing of the aliens to the United States, such circumstances are not present here.

*Id.* at 804-05.

Under the new interpretation announced today, the convictions in *Ramirez-Martinez* and *Angwin* could not stand. *See* Maj. op. 5014-17 & n.17. Although we concluded that Ramirez-Martinez took part in a "concerted action" to bring the aliens to the United States, the evidence tying Ramirez-Martinez to the smuggling operation before the "initial transporter" ceased transporting the aliens was minimal. Similarly, in *Angwin*, the defendant played an "essential role" in a smuggling operation by picking up aliens on this side of the border. As revealed by our analysis there, the importance of the defendant's assistance in *Angwin* did not relate particularly to whether the defendant became involved before or after the

"initial transporter" ceased transporting the aliens, 271 F.3d at 804-05, yet under the majority's view that irrelevant fact will henceforth be determinative.

As these cases illustrate, the purpose of the more sophisticated smuggling operations is not to simply transport the alien across the border. The aliens often pay the smugglers to take them to a less-dangerous prearranged location well within the United States where interdiction resources are scarce or non-existent. For such a scheme to succeed, the operation often relies on accomplices beyond the "initial transporter." In *Flickinger*, we stated that "[t]o prove aiding and abetting [of drug importation], the government was required to demonstrate that [the defendants] participated in the crime of importation and by their actions sought to bring about its success." 573 F.2d at 1359. In this case, as well as in *Ramirez-Martinez* and *Angwin*, the defendants played an essential role in the success of the overall smuggling operation. In order to get the aliens to their final destinations as they had contracted, the principals of the smuggling operations relied on these defendants to transport the aliens from desolate areas just across the border to locations well within the United States where they faced a lower risk of apprehension.

IV

The court erroneously adopts a truncated view of criminal culpability for those involved in sophisticated smuggling operations like this one. Not all smuggling operations end once the initial transporter ceases to have contact with the smuggled aliens. This decision constrains the latitudinous scope of the "brings to" statute and undermines congressional intent to punish any person who aids and abets in the bringing of illegal aliens to their final destination within the United States under 8 U.S.C. § 1342(a)(2). We need to maintain uniformity in our smuggling case law by construing the "brings to" offense under § 1324(a)(2) consistently with how courts

construe the illegal importation of controlled substances under 21 U.S.C. § 952.

In this case, a group of illegal aliens made arrangements with "guides" in Mexico. The aliens agreed to pay smugglers $1500 to smuggle them across the border and bring them safely to Los Angeles, California. The Defendant, Lopez, played an essential role in the success of this smuggling operation. For her part, Lopez was recruited to pick up a car and drive the aliens from a location somewhere near the Mexican border to a gas station in El Centro, California. Because Lopez aided and abetted the venture before the completion of the "brings to" offense—in other words, before the smugglers finally delivered the aliens to Los Angeles as they had contracted—her conviction should be upheld.

I respectfully dissent.